KINGMAN *vs.* SPARROW.

12 201
57h 480

Where a grant of land, from the state, described the land to be located as "all that square mile beginning at the mouth of a creek nearly opposite to the head of Grand Isle on the easterly side of the outlet of Lake Erie," and the northern boundary was to run "westerly to the waters of the said outlet, and thence *along the same to the place of beginning;*" HELD, that the language employed denoted an intention to stop at the edge or margin of the river.

Where, in a deed, the land was bounded " on the west by the *east bank* of the waters of the outlet of Lake Erie ;" *Held,* that no part of the bed of the river passed.

Where a grantee takes, with full knowledge of the claims and actual possession of the state, and subject to its rights, in the premises, nothing can be claimed by him on the ground of adverse possession under color or claim of title.

The common law rule, as applied to the construction of descriptions in a deed bounding the premises by, or 'along, or upon a river, has no application to lands bounded by the Niagara river; that river forming a natural boundary between this country and a foreign nation.

There can be no dower in the right and privilege of taking and using, for hydraulic purposes, a portion of the *surplus waters* of the Erie canal, under a grant from the canal commissioners.

Nor will a permission, given by a resolution of the canal commissioners to erect buildings in the Niagara river, and upon the dam, at Black Rock, create any estate in the lessees of the privilege to use water, of which the widow of one of them can be endowed.

In July, 1838, K. and D. executed to D. and C. a mortgage upon the Erie mills, containing covenants of seisin and warranty, on condition to be void if K. and D. should save D. and C. harmless from all loss by reason of certain liabilities incurred or to be incurred by the latter. In February, 1840, K. and D. executed to D. and C. an instrument specifying the amount due from them to K. and D., and declaring that the mortgage should stand as security for the payment of that amount. A lease of the mills executed by K. and D. to H. for two years, was also assigned to D. and C.; and the instrument contained covenants on the part of K. and D. in relation to insurance, and keeping the mills in repair, and also to pay the water rent due or to grow due to the state. In an action of ejectment by the widow of K. against the lessee of a person claiming under a quit-claim deed from K.; *Held,* that the defendant was not estopped from showing that K. was not seised of such an estate in the premises as to entitle his widow to dower.

EJECTMENT for dower. The action was commenced in 1844, tried December, 1848, and a verdict for the plaintiff subject to the opinion of the court at general term. The facts are sufficiently stated in the opinion.

*Wm. Green*, for the plaintiff.

*Tillinghast & Talcott*, for the defendant.

*By the Court*, MARVIN, J. At any time during the marriage, was George G. Kingman, late husband of the plaintiff, seised of an estate of inheritance of an undivided half, or any portion, of the lands described in the declaration? Unless he was, the plaintiff can not recover

The premises, in which dower is claimed, consist of a portion of Black Rock dam, upon which mills are erected. Dower is claimed in the mills, and also in the storehouse erected upon piles in Black Rock harbor. The dam was erected by the state in 1824-5, in the bed of that part of Niagara river passing between Squaw Island and the east bank of the river. The mills and warehouse were built by Kingman and one Durfee, in 1837-8, and were occupied by them several years. The defendant was in possession when this action was commenced. The defendant claims that the title to the land upon which the mills and storehouse are situated, is in the state, and that Kingman was never seised of an estate of inheritance. After proving the erection of the dam by the state, as a part of the construction of the Erie canal, and the use made of the harbor created by the dam, the defendant introduced a chain of title to certain lands, the western boundary of which, he claims, is the *east bank* of the Niagara river, opposite the *locus in quo*. The plaintiff claims that the western boundary extends to the center or thread of the river, or at any rate, far enough to include the premises demanded.

The first instrument given in evidence, is a patent from the state, dated September 21, 1804, to Jasper Parish, in which the premises are described as "all that mile square of land situate, &c. beginning at the mouth of a creek known by the name of Slayguoguaides creek, nearly opposite to the head of Grand Island, on the easterly side of the outlet of Lake Erie, and to run from thence up the said creek as it winds easterly to the line of the Massachusetts pre-emption; thence along the same

Kingman *v.* Sparrow.

northerly one mile ; thence westerly *to the waters of the said outlet,* and thence along the same to the place of beginning."

Parish, by deed, dated August 25, 1814, granted to Peter B. and Augustus Porter, 500 acres, to be taken off the south part of the above described tract, to be bounded " on the west by the *east bank* of the waters of the outlet of Lake Erie." By a deed of partition between the Porters, in 1810, Peter became seised in severalty of the 500 acres. In this deed the language is " bounded west on the Niagara river." December 6, 1823, Peter B. granted to Augustus Porter an undivided fourth of the 500 acre tract, referring to the deed from Parish. In this deed the boundary is " on the west by the outlet of Lake Erie or Niagara river," &c. December 14, 1824, Peter B. Porter granted to Barton and Thompson one undivided fourth of the 500 acres, (the boundaries are not given in the case,) subject to such locations for the route of canals and towing paths, sites for dam, waste weirs and locks, as may have been laid out and established by public authority, &c. Augustus Porter, by deed, dated April 20, 1824, granted to Hatch an undivided eighth part of the 500 acres. By divers mesne conveyances, subsequent to the date of the deed to Hatch, the title to a portion of the 500 acre tract became vested in William A. Bird and Robert McPherson, as tenants in common with Peter B. Porter. It is described as " lots or parcels of land situate, lying and being at or near the lower end of the harbor of Black Rock, viz. all that certain piece or parcel of land or water lot, bounded as follows : On the east by the canal, on the south by the harbor, on the west by the Niagara river, and on the north by, &c. &c. Subject only to such claims as the state may have on said lot in consequence of their right of navigation, and of the public works connected therewith."

The Black Rock dam and canal had been previously constructed. The canal enters the harbor some little distance above the dam. By other mesne conveyances the title to the lands last described was vested in 1836, in Allen, Taylor and Smith, subject as above stated to the claims of the state. They also acquired all the rights which the state had demised to German,

Bird and McPherson. By indenture dated January 1st, 1827, the canal commissioners, after a public auction, demised, leased, bargained, sold and conveyed, to German, Bird & McPherson, their heirs and assigns, "the right and privilege of taking and using, now and at all times hereafter, for hydraulic purposes, such and so much of the surplus waters of said canal at Black Rock as can be taken under the sale," &c. and without interfering with the due and proper use of the canal and harbor. This was a sale of the right and privilege of only a portion of the surplus waters. The lessees covenanted to pay annually $200 as rent for the right and privilege granted, this sum to be increased in the manner specified in the indenture, and in case of failure to pay, their rights and privileges were to cease, &c. In April, 1833, the canal commissioners, upon the application of the lessees, passed resolutions in reference to the location of buildings and machinery, so as to enable them to use the surplus water. Kingman and Durfee took title from Allen, Taylor and Smith, June 29, 1837. The premises were described as situate in the village of Black Rock, known as 70 feet, describing the portion of the dam and new works erected by the lessees, upon which K. and D. subsequently erected the mills ; together with water power sufficient for nine run of stone. K. and D. covenanted to pay one-fourth of the rent to the state.

The plaintiff's counsel insists that the husband of the demandant was seised in fee of the undivided one-half of the premises, by virtue of the conveyance from the state to Parish and the mesne conveyances to Kingman and Durfee. The state granted to Parish all that *square mile* of land situate &c. on the *easterly side* of the outlet of Lake Erie. Its northern boundary runs westerly " to the waters of the said outlet, and thence along the same to the place of beginning."

The land granted to Parish was a part of the mile strip along Niagara river, not included in the treaty of 1797 between the Seneca nation and Robert Morris, by which the Seneca nation granted nearly all their lands in western New-York. In that treaty the land is mentioned as " a tract of land one mile in width, lying on and along the east side of the *strait* of Niagara."

Kingman v. Sparrow.

(*Am. State Papers, Indian Affairs*, 627.) In 1802 the Seneca nation sold, ceded, released and quit-claimed to the state of New-York the mile strip, and the state became bound to grant to Parish, his heirs and assigns, one mile square of this strip.

It appears to me that the language employed in the patent to Parish denoted an intention to stop at the edge or margin of the river. The land to be located was " all that square mile—beginning at the mouth of a creek nearly opposite to the head of Grand Isle, on the easterly side of the outlet of Lake Erie." There can be no doubt as to the point where the survey is to commence. It begins at the *mouth of the creek* which discharges into the river upon the east side. The northern boundary is to run " westerly to the waters of the said outlet, and thence *along the same to the place of beginning.*" The river, at this place, is three-fourths of a mile wide. In the treaty with Morris it is styled " the strait of Niagara." In the grant to Parish, the western boundary is not the *river* or *outlet eo nomine*, but the *waters* of the outlet. The river as a whole is not referred to as a boundary. When a river is designated as a boundary, it is an entire thing, and generally by intendment of law the line goes to the center or thread.

Whatever may be the proper construction of the description in the patent to Parish, it is clear that by the grant from Parish to the Porters, no part of the bed of the river passed. In that deed the land is bounded " on the west by the *east bank* of the waters of the outlet of Lake Erie." This entirely excluded the river. (*Childs* v. *Starr*, 4 *Hill*, 369, *and cases cited by the chancellor, and Bradish, president.*) As the Porters acquired no title to the bed of the river, they could grant none. The first grant of either of the Porters to any other person is the grant to Hatch, April 20, 1826, of one-fourth of the 500 acre tract. The boundaries in this deed do not appear in the case, but this was after the state had erected the dam abutting upon the lands held by the Porters, and Hatch took subject to all the rights of the state. All the subsequent grants are subject to the same rights. Kingman and Durfee took with full knowledge of the claims and actual possession of the state, and subject to all its

rights.   Nothing can therefore be claimed on the ground of adverse possession under color or claim of title.   But independent of this view of the case, I am prepared to hold that the common law rule as applied to the construction of descriptions in a deed bounding the premises by, or along, or upon a river, has no application to lands bounded by the Niagara river.   I am not aware that this question has been decided.   The question has been much discussed in this state, whether the common law rule should be applied to the large navigable rivers in this country.   I shall not enter into the discussion, but content myself with a reference to some of the cases.   (*Canal Com'rs* v. *The People,* 5 *Wend.* 423 ; *S. C. in court of errors,* 17 *Id.* 597.)

Chancellor Walworth has in several cases maintained, with great learning and ability, the applicability of the common law rule to our rivers.   He says, however, that " the principle itself does not appear to be sufficiently broad to embrace our large fresh water lakes and inland seas, which are wholly unprovided for by the common law of England." (*Canal Com'rs* v. *The People,* 5 *Wend.* 447.)   In the same case, (17 *Id.* 597,) he says, " A different rule must probably prevail as to our large navigable lakes, which are mere inland seas, although there is neither ebb or reflux of the tide ; and also as to those lakes and streams which form the natural boundaries between us and a foreign nation."   Other members of the court expressed the opinion that the English rule had no application to the large navigable rivers of this country.   But the exception contained in the chancellor's opinion is sufficient to exclude the operation of the rule where lands are bounded by or upon the Niagara river.   It forms the natural boundary between this country and a foreign nation.   The state has always claimed the islands in the river, and has granted them.   The papers in the present case show that Parish, in 1817, took a patent from the state, of " Squaw Island," lying in the Niagara river opposite the premises granted to him in 1804, and upon which island the Black Rock dam abuts.   If the lands granted by the patent of 1804 extended to the center of the river, Parish then obtained title in all that part of Squaw Island lying opposite the "mile square," and there

was no occasion for his purchase in 1817. This shows the construction given by the parties to the patent of 1804. The plaintiff also claims that her husband was seised of an estate of inheritance through title from the state, subsequent to the erection of the dam, referring to the indenture dated January 1, 1847, between the canal commissioners and Jermain, Bird and McPherson. The canal commissioners only sold, demised, &c. the "right and privilege of taking and using at all times for hydraulic purposes," a portion of the *surplus waters* of the canal at Black Rock. This was a mere right and privilege to use surplus water. There could be no dower in such a right. Nor did the permission which the canal commissioners gave, by the resolutions of 1833, to erect buildings in the river and upon the dam, create any estate in the lessees of the privilege to use water, of which a widow of one of them could be endowed.

It remains to consider the question, most urged upon the argument, arising upon the following state of facts. Kingman and Durfee, in July, 1838, executed to Dows & Cary a mortgage of the Erie mills, upon condition to be void if they should save D. and C. harmless from all loss by reason of certain liabilities incurred or to be incurred by them. The mortgage contained a covenant on the part of K. and D. that they were the true and lawful owners of the mill property conveyed, and that they had a perfect and absolute estate of inheritance in fee simple in the said property, and full power, &c. to grant, &c. the same. In February, 1840, K. and D. executed to D. and C. an instrument reciting the principal provisions in the mortgage, and containing a liquidation of the amount owing by them to C. and D. and declaring that the mortgage should stand as security for the payment of such sum at the times therein mentioned. It was also declared in the instrument that K. & D. had made a lease of the mills for two years to one Halley, which lease they assigned to D. and C. The instrument contains divers covenants on the part of K. and D. in relation to insurance, and keeping the mills in repair, and also to pay the water rent due or to grow due the state. A witness stated that he had heard the defendant say that he occupied under Dows and Cary, and that the rent

was paid to them. Another witness stated that Dows and Cary went into possession under the mortgage and agreement; that the lease to Halley was delivered to them, and that Kingman and Durfee were never again in possession. That in 1844 the defendant was tenant of D. and C. and paid them rent. In February, 1841, Kingman, by a quit-claim deed, granted the mills and premises to Halley. Durfee, in August, 1841, granted, by a quit-claim deed, the equal, undivided half of the premises to the defendant. April 22, 1842, Halley and the defendant granted the premises by a quit-claim deed to Ira B. Cary.

The plaintiff's counsel insists that the mortgage with covenants of warranty and seisin from Kingman and Durfee to Dows and Cary, and the acceptance by the latter of possession under it, and the agreement of February 14, 1840, estop them and the defendant from denying the title of Kingman, the plaintiff's husband. And the counsel endeavored to take the case as it now appears, out of the principle established by the court of appeals in this case. (1 *Comst.* 242.) When the case was before the court of appeals, the mortgage and agreement were not in it. It then stood upon the title which Cary had acquired through the quit-claim deeds. The judge at the circuit had decided, that the defendant, as the tenant of Cary, was estopped from denying the seisin of the demandant's husband. The supreme court sustained this decision, and the court of appeals reversed their judgment. The precise point decided, therefore was, that in an action of ejectment for dower, against a grantee of the husband by *quit-claim deed,* or a person holding under such grantee, the defendant was not estopped from showing that the husband was not seised of an estate of inheritance so as to entitle his widow to dower. In my opinion the principles upon which the case was decided by the court of appeals, equally apply to the case as it now stands. Assuming that Dows and Cary entered under the mortgage containing covenants of title, and subsequently acquired, by the quit-claim deeds, the equity of redemption, they are not estopped from showing that Kingman had no title. Without entering into the argument, I refer to the prevailing opinion in the court of appeals, delivered by Judge Wright. He review-

ed the previous cases, in several of which, the defendants held under deeds containing covenants of warranty, and exposes the errors into which the courts had fallen. His argument and authorities are as applicable to the case in its present shape, as they were to the case as it then stood before the court.

Having come to the conclusion that the defendant was not estopped from showing a want of seisin in the husband of the plaintiff, and that he was not seised of such an estate as entitles his widow to dower, it is not necessary to consider other questions raised and presented by the defendant. There must be judgment for the defendant upon the case.

[ERIE GENERAL TERM, November 10, 1851. *Mullett, Marvin* and *Hoyt,* Justices.]