# Law and Equity

IN THE

# SUPREME COURT

OF THE

# STATE OF NEW YORK.

———◆———

## Morgan and others *vs.* King and others.

The provision in the constitution of 1777, declaring that such parts of the common law of England as were in force on the 19th day of April, 1775, should be and continue the law of this state, subject to alteration by the legislature, was nothing more nor less than an adoption of the *essential principles* of the common law, the application of which, to the condition of things here, often requires a modification, if not an entire change, of its rules; but which is merely the result of the application of general principles to particular facts. *Per* James, J.

The principle is essentially the same, under all circumstances, but the rule, or mode, or standard, of application will vary with the facts, or the nature or character of the subject, to which the application is to be made. *Per* James, J.

In adopting the common law, we have adopted its fundamental principles and modes of reasoning, and the substance of its rules, as illustrated by the reasons on which they are based, rather than by the mere words in which they are expressed. *Per* James, J.

The doctrine is fully established that in fresh water rivers, where the tide does not rise, except in our large lakes and rivers forming the boundary between us and other states and nations, the ownership of the citizen is of the

whole river—the soil and the water—subject to the servitude of the public interest or right of way. *Per* JAMES, J.

The right of public servitude, in a stream, depends not upon its navigability, in the common law sense of the term, but upon its capacity for the purposes of trade, business and commerce.

Any stream, capable of being used in the transportation of any kind of property to market—whether in boats, rafts or single pieces—whether guided by the hand of man, or floated at random on the water, is a public stream, and subject to the public easement.

Adopting that rule as a correct exposition of the common law as understood in this country, and applying it to the facts of this case, the Racket river is, and was always, a public highway. POTTER, J. dissented.

APPEAL from a judgment. Cause tried by the court without a jury. The action was for obstructing the passage of saw logs floating in the Racket river. The plaintiffs were the owners of certain premises on the said river, on which was erected a dam and saw-mill. About two and a half miles above, the defendants owned the land on both sides of the river, on which stood a saw-mill, and across the stream a dam and boom. Both parties claimed title through the same patent from the state, granted in 1787. The patent covered the whole township, without reservation, except as to mines of gold and silver. The plaintiffs' logs were detained by the defendants' booms, which was the obstruction complained of. The court found for the plaintiffs, upon which report judgment was entered.

*Brown & Spencer*, for the plaintiffs.

*Dart & Tappan*, for the defendants.

JAMES, J. In this case the court reported the facts found, and the conclusions of law thereon. No exceptions were taken to the finding of facts; but the exceptions are to the conclusions of law arising upon those facts; and the single question is, has the public a right of way over the waters of the Racket river, at the place of detention; or, in other words,

Morgan *v.* King.

was this river, in its natural state, such a stream as was subject to the public easement.

The facts from which this question is to be determined are these : "The river is 160 miles long ; from its mouth to Raymondsville, 20 miles, it is boatable, and has been declared a public highway by legislative enactment, from Raymondsville to Potsdam, 14 miles, which includes the premises of the parties ; its bed rises 250 feet ; the stream is rapid, rough and rocky, and upon it are twelve dams ; from Potsdam to Colton, nine miles, its bed rises 400 feet ; beyond Colton are lakes, and a stretch of navigable water 52 miles in length, with only one mile of rapid ; the average width of the river is 18 rods ; its average rise in freshets is from 3 to $3\frac{1}{2}$ feet ; from 1810 to 1850, saw logs, lumber and timber had been floated from two miles above Potsdam to Raymondsville, in small quantities ; from Colton to Raymondsville the river, in its natural state, is not capable, at any season, of being navigated by vessels, barges, lighters or rafts ; but during the seasons of high water, in each year, it has capacity for floating to market saw logs and timber in single pieces ; from Raymondsville to Colton are nine saw mills in operation, some of which make 45,000 feet of lumber per day ; which are, and only can be, supplied with logs by floating them down said river ; this trade has mostly sprung up since 1850."

Upon these facts, the special term held " that Racket river, in its natural state, being of sufficient capacity in seasons of high water to float logs and timber to market, is a public highway at common law ; that the riparian proprietors own the bed of the stream subject to the public right of easement."

The defendants' counsel claims, 1st. " That the constitution adopted in this state in 1777, expressly retained the common law of England, except as modified by statute. 2d. That the patent of the premises was issued in 1787, and unless the river was then *navigable* within the common law meaning of that term, it carried with it the bed of the stream. 3d. That the common law of England is applicable to the rivers in this

Morgan *v.* King.

country. 4th. That by the common law, streams which are so small, shallow or rapid, as not to afford a passage for the king's people and are not *navigable* for boats, or vessels, or rafts, are altogether private property: navigable refers to something steered or managed. 5th. That where the common law applies to a subject existing in this country, the courts can no more change it, nor disregard it, than they can a statutory enactment or constitutional provision."

It was established that the title of the defendants to their premises came through a patent granted by the state in 1787, under the constitution adopted in 1777. That constitution provided, among other things, that "Such parts of the common law of England, the statute law of England and Great Britain, and the acts of the legislature of the colony of New York, as together did form the law of said colony on the 19th day of April, 1775, should be and continue the law of the state, subject to such alterations as the legislature should make concerning the same." The patent from the state contained no reservation of any right of way, or use of the streams, and it may therefore be conceded that the right of the patentee and his grantees, whatever it be, became fixed on the delivery of the grant by the state; and that that right has not been affected by any subsequent legislative enactment. Unless the public right of servitude in the river existed at the date of the patent, it does not now; and if it did exist at that time, it was a public right; the state had no power to dispose of it; and it did not pass by the grant. (*Canal Appraisers* v. *The People*, 17 *Wend.* 624. 26 *id.* 404. 17 *John.* 195.)

The defendants' right to the bed of the river and tne use of the same with the waters subject to the public easement, is conceded.

I will now proceed to consider the common law of England; its principles as applicable to this subject; how far those principles were adopted; and their application, by the courts of this and other states.

As was said by Greene, justice, in *The People* v. *Randolph*,

Morgan *v.* King.

(2 *Park. Cr. Rep.* 176,) " The common law consists of those principles and maxims, usages and rules of action, which observation and experience have commended to enlightened reason as best calculated for the government and security of persons and property.    Its principles are developed by *judicial decisions as necessities arise,* from time to time, demanding the application of those principles to particular cases in the administration of justice.    The authority for its rules does not depend upon positive legislative enactment, but upon the principles which they are designed to enforce—the nature of the subject to which they are to be applied, and their tendency to accomplish the ends of justice."    " It follows that these rules are not arbitrary in their nature nor invariable in their application ; but, from their nature, as well as the necessities in which they originate, they are, and must be, susceptible of a modified application suited to the subject upon which that application is to be made."

The principles of the common law, as its theory assumes and its history proves, are not exclusively applicable, or suited, to our country, or condition of society ; but, on the contrary, by reason of its property of expansibility and flexibility, their application to many, is practicable.    The adoption of the common law, in the most general terms, by the government of any country, would not necessarily require or admit of an unqualified application of all its rules, without regard to local circumstances, however well settled and generally received those rules might be.    Its rules are modified upon its own principles and not in violation of them.    The language of the constitutional provision above quoted is, " Such parts of the common law as were in force on the 19th day of April, 1775, shall be and continue the law of this state."    What parts of that law were then in force here ?    None, upon the subject now under consideration, except what resulted from our colonial dependence.    Upon the principles already stated, so much only of the common law was in force in the colony by virtue of that relation as was applicable to the condition of things

here. This proposition is sustained by the highest authority. Sir William Blackstone (1 *Com. p.* 107) says, "It hath been held, that if an uninhabited country be discovered and planted by English subjects, all the English laws then in being, are immediately there in force. But this must be understood with a great many restrictions. Such colonists carry with them only *so much* of the English law as is applicable to their own situation, and *the condition of the infant colony."* Kent (1 *Com.* 472) lays down the same rule with regard to the extent to which the common law was applicable in the colonies, and its subsequent adoption by the constitution of the several states. He says, "The common law, so far as it is applicable, has been recognized and adopted as one entire system by the constitutions of New York, Massachusetts, New Jersey and Maryland. It has been assumed by the courts of justice, or declared by statute, with the like modifications, as the law of the land. It was imported by our colonial ancestors, as far as it was applicable, and was sanctioned by royal charters and colonial statutes."

This apparently qualified adoption of the common law, is nothing more nor less than *an adoption of its essential principles,* the application of which to the condition of things in the new country often requires a modification, if not an entire change, of its rules; but which, after all, is nothing more than the result of the application of general principles to particular facts. The principle is essentially the same under all circumstances; but the rule, or mode, or standard of application, will vary with the facts, or the nature, or the character of, the subject to which the application is to be made.

Again; when it is said that we have in this country adopted the common law of England, it is not meant that we have adopted any mere formal rules, or any written code, or the mere verbiage in which the common law is expressed. It is aptly termed the *unwritten law* of England; and we have adopted it as a constantly improving *science,* rather than as an *art;* as a system of *legal logic,* rather than as a *code of rules.*

In short, in adopting the common law, we have adopted its fundamental principles and modes of reasoning, and the substance of its rules, as illustrated by the reasons on which they are based, rather than by the mere words in which they are expressed.

As an illustration of this, some of our judges and jurists have expressed the opinion that the common law rule relative to the rights of riparian owners on rivers above the flux and reflux of the tide, does not prevail in respect to our large lakes or large navigable rivers. (3 *Kent*, 427, *n.* 5 *Wend.* 447. 17 *id.* 597, 621. 20 *id.* 208. 12 *Barb.* 206. 19 *id.* 484.) Such may now be regarded as the law of this state.

The *Hargrave Tracts*, or the treatise *De Jure Maris*, embodies the principles of the common law relating to the respective rights of the public or the citizen, in the sea, arms of the sea, and in salt and fresh water rivers and streams. The general distinctions thus established are, that fresh water rivers, of what kind soever, do of common right belong to the owners of the soil; yet, though of private right, may be affected by a public servitude. It says "There be some streams or rivers, that are private, not only in propriety or ownership, but also in use, as little streams and rivers, that are not of common passage for the king's people; there be other rivers, as well fresh as salt, that are of common or public use, for carriage of boats and lighters; and these are *prima facie* common highways for man, or goods, or both, from one inclosed town to another." And the doctrine is fully established, that in fresh water rivers, where the tide does not rise, except in our large lakes and rivers forming the boundary between us and other states and nations, the ownership of the citizen is of the whole river—the soil and the water—subject to the servitude of the public interest or right of way. (*Ex parte Jennings*, 6 *Cowen*, 536, *and see note.* 26 *Wend.* 404.)

It is therefore conceded that the principles of the common law, in relation to the question under consideration, so far as the same are applicable to the nature, character and condition

of our fresh water streams, were in force in this state at the date of the patent under which the defendants claim.

It is the duty of the court, in this case, to apply those principles to the Racket river, and determine whether it was susceptible of such use as made it a public highway.

Its character must be determined by its capacity for public use; and the extent of capacity requisite to give the public an easement in a fresh water stream, must be ascertained by the application of the principles of the common law to the nature of the subject, and the circumstances under which that application is to be made. We are not bound to follow the letter of the common law, forgetful of its spirit; its *rule* instead of its principle. A *rule* of law applicable to the fresh water streams of England may be wholly inapplicable to fresh water streams in this country of the same nature and character, because of different capacity, or because the adjoining country may furnish a commerce for them unknown in England, and yet be subject to the same *principle*. If so, the common law modifies its rules upon its own principles, and conforms them to the wants of the community, the nature, character and capacity of the subject to which they are to be applied.

The defendants insist that, unless the Racket river was *navigable*, within the common law meaning of the term, they have the absolute fee in its bed and flow of water. Navigability is not the true test. A *navigable* river, in the common law use of the term, is one in which the tide ebbs and flows. (*Fishery of the Banne, Davies' R.* 152. *Palmer* v. *Mulligan*, 3 *Caines*, 318.) In *Ex parte Jennings*, (6 *Cowen*, 518,) the court say: "By the term *navigable river*, the law does not mean such as are navigable in common parlance. The term has in law a technical meaning, and applies to streams, rivers or arms of the sea, where the tide ebbs and flows."

The right of public servitude in a stream depends, not upon its navigability, in the common law sense of the term, but upon its capacity for the purposes of trade, business and com-

Morgan v. King.

merce. The *Hargrave Tracts* define fresh water rivers, deemed public, to be such as float vessels, boats and lighters. Mr. Butler, in his notes (205) to *Co. Litt.*, says, a river where boats, rafts, &c. may be floated to market, is a public river.

In this country, our courts, following the principles of the common law, and adapting them to the subjects presented for their application, have recognized other and still more primitive modes of transportation as evidence of capacity.

*Putnam* v. *Mulligan* (3 *Caines*, 307) was an action for erecting a dam on the Hudson river at Stillwater, diverting water, &c. from the plaintiff's mill. On the trial, the point was taken that the plaintiff's mill being on a public stream was a nuisance, and no right of action existed for its obstruction, &c. On this point Justice Spencer said: "Whether the Hudson river be considered as a public highway, or the bed of it as belonging to the owners of the adjacent shores, will not, I think, vary the result. I cannot but consider it as a common highway, independent of its being navigable with small craft and rafts above the place in dispute." Justice Thompson said: "It is a fact of public notoriety that the tide does not ebb and flow as high up the Hudson river as the place in question, and therefore the land under water is as much the subject of private grant as the land adjoining the river, subject however to be used by the public for the purposes of boating and rafting, and *other objects of this description,* as far as it shall be necessary for public use and accommodation." These are the rules and distinctions adopted by Hargrave, and which appear just and reasonable. Chief Justice Kent, after quoting from the *Hargrave Tracts,* "that the *Wey, Severn,* &c., as well above as below the tide, as well in the part where they are private as of public property, are public rivers, not in reference to the property of the river, but to the public use," says: "This is the true and just rule *which harmonizes private right with public interest.* The Hudson at Stillwater is capable of being held and enjoyed as private property; but it is notwithstanding to be deemed a

public highway for public uses, such as that of rafting lumber," &c.

In *Shaw* v. *Crawford*, (10 *John.* 237,) the court say: " Where a river is so far navigable *as to be of public use-in the transportation of property, the public claims* to such navigation ought to be *liberally supported.* The free' use of waters which can be made subservient to commerce, has, by the general sense of mankind, been considered as a thing of common right." (*See Hooker* v. *Cummings,* 20 *John.* 90 ; *The People* v. *Platt,* 17 *id.* 211.)

In *Browne* v. *Scofield*, (8 *Barb.* 239, 243,) Johnson, justice, says : " That this river (Canisteo) was a public highway at common law, as it has always been understood and applied in this country, is abundantly established by the evidence. Not only in this state, but in all our sister states, these great natural channels and avenues of commerce, *wherever they are found of sufficient capacity to float the products of the mines, the forest, or the tillage of the country through which they flow, to market,* have always been adjudged by our courts to be subject to the right of passage, independent of legislation."

So in Maine. The court, in *Browne* v. *Chadbourn*, (31 *Maine Rep.* 9,) held that, " if a fresh water stream is inherently and in its nature capable of being used for the purposes of commerce, or for the floating of vessels, boats, rafts or logs, it may be so used by the public, leaving to the owners of the bed all other modes of use not inconsistent with this easement." " And the stream need not be capable of such use during the whole year. So that a stream not containing sufficient water, in its ordinary state, for the floating of logs, may yet be used by the public for that purpose whenever its condition admits."

1st. The rule to be deduced from these authorities is, that any stream capable of being used in the transportation of any kind of property to market—whether in boats, rafts or single pieces—whether guided by the hand of man or floated at ran-

dom on the water, is a public stream, and subject to the public easement.

2d. Adopting the rule thus laid down as a correct exposition of the common law as understood in this country, and applying that rule to the facts of this case, the Racket river is, and was always, a public highway.

3d. The facts show that upon this stream there is an immense commerce in saw logs and manufactured lumber; that this river, in its natural state, at the place of obstruction, has ample capacity to transport that commerce to market in a cheap and expeditious mode. It is not necessary that that commerce should be transported in crafts or rafts that can be guided by the hand of man. The test of capacity is not alone in the nature or character of the craft, nor how guided, or whether guided at all. If it has capacity sufficient to transport to market the whole, or a part, of the commerce, no matter of what particular character, that grows or gathers upon its banks, it is subject to the public servitude. If it can do this, to that extent it is a public highway, within the principles of the common law.

If, in course of time, the particular commerce which alone it is capable of bearing, ceases to gather upon its banks, then will cease the public use of the river as a highway.

It was also argued that the construction contended for by the plaintiff, if adopted, would "convert every private mill stream, creek, rivulet or ravine, which passes the surface flood at spring freshets, into a public highway." I do not anticipate any such result. If any such mill stream, creek, rivulet or ravine has sufficient capacity to transport on its surface the products growing upon its banks to market, it would, and of right ought to be, a public highway, but not otherwise. But there is such a vast difference between a stream 160 miles long, 18 rods wide, with 70 miles of navigation upon it, and private mill streams, creeks, rivulets and ravines, that the correct application of a principle to one will furnish no precedent for the misapplication of that principle to the other.

The fact was fully established, that Racket river, in its natural state, at certain seasons of the year and in a certain way, had capacity, and was susceptible of, public use, in transporting to market certain products of the country through which it passed; having such capacity and adaptability, it was, according to the principles of the common law as applied in this country, a public highway.

The judgment should therefore be affirmed.

C. L. ALLEN, J., concurred.

POTTER, J., dissented.

                                     Judgment affirmed.

