(79 Misc. Rep. 279.)

### STRAWBERRY ISLAND CO. v. COWLES et al.

(Supreme Court, Special Term, Erie County. July, 1912.)

1. NAVIGABLE WATERS (§ 36*)—TITLE TO BED OF RIVER—TREATIES.

    The treaty between New York and Massachusetts of 1786, which reserves to New York a strip a mile in width along the easterly side and for the whole length of the Niagara river, vests in New York title to the strip, and New York must be deemed the owner in fee of the bed of the river in trust for the public and for the benefit of commerce, subject to the paramount right of Congress to control navigation of the river for the regulation of interstate and foreign commerce.

    [Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 180–200; Dec. Dig. § 36.*]

2. NAVIGABLE WATERS (§ 42*) — ISLANDS IN NAVIGABLE STREAMS — OWNERSHIP.

    The title of owners of an island in the Niagara river extends to the mean water line of the river, and they acquire no title to the bed thereof, or to the sand and gravel deposited therein.

    [Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 253–255; Dec. Dig. § 42.*]

3. NAVIGABLE WATERS (§ 39*)—ISLANDS IN NAVIGABLE STREAMS—OWNERSHIP.

    The owners of uplands on a river will be protected against the acts of persons taking from the river material so immediately adjacent to

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the· uplands as to take away the natural support thereof, and cause it to fall into the river, but they have no right to enjoin the taking of sand and gravel from the river bottom so far out into the stream as not to imperil the uplands.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 21, 53, 82, 103, 117, 127, 239–244; Dec. Dig. § 39.*]

4. INJUNCTION (§§ 211, 212*)—CONSENT TO ENTRY OF JUDGMENT—EFFECT.

A defendant who voluntarily consents to the entry of a judgment containing an injunction restraining him is bound thereby, though the court had no right under the facts to issue the injunction, but the injunction is not binding on one not a party, and does not establish as against him any right in plaintiff.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 434, 435; Dec. Dig. §§ 211,. 212.*]

5. NAVIGABLE WATERS (§ 36*)—BRINGING IN STATE AS PARTY—BED OF NAVIGABLE STREAMS—TITLE OF STATE.

The court in a suit by an owner of an island in a river, the bed of which is owned by the state, to restrain individuals from taking sand and gravel from the bed, may not bring the state into the suit as a party at the request of one having no right as a licensee of the state to the sand and gravel.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 180–200; Dec. Dig. § 36.*]

6. NAVIGABLE WATERS (§ 36*)—INTERVENTION—BED OF NAVIGABLE STREAMS—TITLE TO SAND AND GRAVEL DEPOSITS.

· One having no right as a licensee of the state to the sand and gravel deposited in the bed of a navigable river has no right to intervene in an action by an owner of an island. in the river to enjoin the removal by individuals of the deposits.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 180–200; Dec. Dig. § 36.*]

7. JUDGMENT (§ 346*)—RIGHT TO ATTACK CONSENT JUDGMENT—INTERVENTION IN SUIT.

A decree entered pursuant to the agreement of the parties may not be attacked by one not a party, on the ground that the decree carries out an agreement violative of the federal and state anti-trust statutes, and such violations must be· prosecuted by separate action, and not by intervention in the suit for the vacation of the decree.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. § 678; Dec. Dig. § 346.*]

8. INJUNCTION (§ 228*)—VIOLATION—PARTIES LIABLE.

One not a party to a suit cannot be prosecuted for disobeying an injunction entered pursuant to the agreement of the parties merely because it restrains all persons, unless he acted as agent of, or in collusion with, the actual parties.

· [Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 484–495; Dec. Dig. § 228.*]

9. INJUNCTION (§ 226*)—VIOLATION—ACTS CONSTITUTING.

An unintentional violation of an injunction not causing any damage to the party obtaining the injunction presents no case for punishment for contempt.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. § 478; Dec. Dig. § 226.*]

Action by the Strawberry Island Company against Benjamin L. Cowles and others. Motions by the assignee of plaintiff to punish certain persons for contempt of court, and by the James Harrigan

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Company to vacate the judgment in the action, and for an order directing that the state of New York and the James Harrigan Company be made parties to the action, with permission to defend, and for an order modifying the injunction provisions of the judgment. Denied.

Charles Diebold, Jr., of Buffalo, in support of motion to punish for contempt.

Adelbert Moot and Charles L. Bullymore, both of Buffalo, in support of motion to intervene, etc.

WHEELER, J. The plaintiff in this action was the owner of the upper or southerly portion of Strawberry Island in the Niagara river, consisting of about 15 acres of land. The distance from the easterly banks of the island to the banks of the Niagara river varies from 1,800 to 2,100 feet, making the distance to the center of the stream from 900 to 1,050 feet. The government maps and surveys show that the depth of the river varies at different points. Along and in the immediate proximity to the eastern banks of Strawberry Island the waters are shallow. They increase, however, in depth as one proceeds easterly toward the main channel between the island and the main shore. The deepest part of the channel is east of the middle of the stream. Near the banks of the island the maps show a depth of water of from two to four feet. This gradually deepens until in the channel it reaches an average depth of about 25 feet. The current in the Niagara river above the island is very swift; but near the island becomes more sluggish. The natural result is that the river brings down quantities of sand and gravel which is deposited on the river bottom between the banks of the island and the main channel. This is valuable for commercial purposes, and the real bone of contention out of which this litigation grows is over the right to take this sand and gravel from the river bed and dispose of it in the market.

The plaintiff brought this action against the defendant Cowles and five other parties defendant to restrain them from taking sand and gravel from the river bed opposite the island. It appears that after the commencement of the suit, pursuant to some agreement reached between the parties to the litigation, and to an offer of judgment made by the defendants, a final judgment was entered in this action, whereby the defendants, their officers and agents, "and all persons whomsoever * * * though not named herein," were enjoined "from excavating, removing, or otherwise interfering with the sand, gravel, and other material constituting the shores and beach of the part of Strawberry Island owned by the plaintiff" (describing by metes and bounds the upper part of the island), "and from excavating, removing, or otherwise interfering with the shoals, bars, and deposits of sand, gravel, and other material, formed by the natural action of the Niagara river and deposited in the river bed, and extending under the waters of the said river from the shores of said part of Strawberry Island owned by the plaintiff to the thread of the Niagara river around said part of Strawberry Island owned by the plaintiff" (de-

scribing by metes and bounds the upper part of the island), "and from excavating, removing, or otherwise interfering with the shoals, bars, and deposits of sand, gravel, and other material formed by the natural action of the Niagara river and deposited on the river bed, and extending under the waters of the said river from the shores of said part of Strawberry Island owned by the plaintiff to the thread of the Niagara river around said part of Strawberry Island owned by the plaintiff."

Since the entry of this decree the plaintiff has sold that portion of Strawberry Island so owned by it to the Border Island Company, which company has also acquired title to the northerly part of the island. The plaintiff has also assigned to the Border Island Company the judgment in question. The Border Island Company now seeks to punish as for contempt the James Harrigan Company and others in the employ of that company for violating the decree of injunction, alleging they have taken sand and gravel from the river bed in disobedience of the injunction in question. The parties brought into court not only deny any violation of the injunction, but the James Harrigan Company, by separate motion, asks permission to intervene, to have it and the state of New York made parties defendant, to vacate and set aside the judgment entered, and for other relief.

In the disposition of these motions, we must necessarily inquire into the question as to what rights the various parties before us have in the bed of the Niagara river, and to the deposits of sand and gravel made therein. We may take judicial notice that the Niagara river is a navigable stream, and constitutes an international boundary between the United States and the Dominion of Canada.

[1] It is a matter of common knowledge that conflicting claims existed at the close of the Revolution between the states of New York and Massachusetts as to the ownership of the territory comprising Western New York. Massachusetts claimed under and by virtue of English grants to the Plymouth Colony, and New York claimed by virtue of grants through the Duke of York. These differences were settled by the treaty and cession of 1786, made at Hartford, between New York and Massachusetts; by which Massachusetts was given the proprietary right to that part of the state west of what is known as the pre-emption line (running from Pennsylvania northerly through Seneca Lake), while the political sovereignty over the same territory was given to and acknowledged to be in the state of New York. There was, however, by this treaty, reserved to the state of New York a strip one mile in width (commonly known as the mile strip) along the easterly side and for the whole length of the Niagara river. Under this treaty, therefore, the title to this mile strip became vested in the state of New York.

In the very important case of the Illinois Central Railroad v. Illinois, 146 U. S. 435, 13 Sup. Ct. 111, 36 L. Ed. 1018, the court said:

"It is the settled law of the country that the ownership of, and dominion and sovereignty over, lands covered by tide waters within the limits of the several states, belong to the respective states within which they are found, with the consequent right to dispose of any portion thereof, when that can be done without substantial impairment of the interest of the public in the

waters, and subject always to the paramount right of Congress to control their navigation so far as may be necessary for the regulation of commerce with foreign nations and among the states"—citing Pollard's Lessee v. Hagan, 3 How. 212, 11 L. Ed. 565; Weber v. Harbor Commissioners, 18 Wall. 57, 21 L. Ed. 798.

The court then proceeded, and held that the same doctrine or rule of law in this country is applicable to lands covered by fresh water in the Great Lakes, over which is conducted an extensive commerce with different states and foreign nations.

In the later case of the United States v. Chandler-Dunbar Co., 209 U. S. 447, 28 Sup. Ct. 579, 52 L. Ed. 881, the same doctrine was applied to lands in the Sault Ste. Marie River between Lake Huron and Lake Superior. It applies with equal force to the land under water in the Niagara river between Lake Erie and Lake Ontario.

The decisions of the courts of New York are in harmony with those of the United States courts. The question as to the ownership of the bed of the Niagara river was up in the case of Matter of Commissioners of State Reservation, 37 Hun (N. Y.) 537, where the court held that, inasmuch as the Niagara river was in fact navigable and constituted the natural boundary between the United States and Canada, the title to the bed of the stream remained in the state, and did not pass by grant to the riparian owners. The court in its opinion calls attention to the American doctrine to the effect that in rivers of this character navigable in fact, and forming natural international boundaries, grants of land bounded on, along, or by such streams do not convey to the middle of the stream, but only to high-water mark, in this respect, the rule of law differing from the doctrine of the old common law established by the English courts. After referring to the rule of the common law, the court, in the case last cited, said:

"It is generally conceded that this doctrine of the common law is inapplicable to the vast fresh water lakes, or inland seas of this country, or streams forming the boundary lines of states. And in the Tibbits Case [17 Wend. 571] the Chancellor, while supporting the application of the common-law rule to the rivers in this state, adds that a different rule must probably prevail as to those streams which form the natural boundaries between us and a foreign nation, and supports that proposition by very good reasons founded neither in the common or civil law, but in reasons national and international."

The court then added that:

"The line between the United States and Canada is located in the center of the Niagara river (Treaty of 1783; 8 U. S. Statutes at Large, 55, and that of Ghent in 1814, Id. 221), and as such is the boundary of Niagara county (Laws of 1808, c. 60)."

See, also, Kingman v. Sparrow, 12 Barb. 201, where the same rule of law is asserted; also, Morgan v. King, 30 Barb. 9–15; Ex parte Jennings, 6 Cow. 536, and note, 16 Am. Dec. 447; Champlain & St. Lawrence R. R. Co. v. Valentine, 19 Barb. 484–490. The general doctrine that the common-law rule that grants bounded by streams carry to the center or usque ad filum aquæ has no application to the great inland lakes, or rivers forming territorial boundaries, was again discussed and approved in the very recent case of Fulton L. H. & P. Co.

v. State of N. Y., 200 N. Y. 400–413, 94 N. E. 199, 37 L. R. A. (N. S.) 307.

We deem it established by the highest authority that the state of New York is the owner of the fee of the bed of the Niagara river. It has repeatedly exercised the right of ownership by granting and conveying to the upland or riparian owners land under water for the purpose of building docks, wharves, and piers in the interest of commerce. We therefore must conclude that the state is to be deemed the owner in fee of the bed of the Niagara river. This ownership, however, is one in trust for the public, and for the benefit of commerce, and subject always to the paramount right of the federal Congress to the control of the navigation of the waters of the river so far as may be necessary for the regulation of commerce with foreign nations and among the states. Ill. Cent. R. R. Co. v. Illinois, 146 U. S. 387, 452, 453, 13 Sup. Ct. 110, 118 (36 L. Ed. 1018). The court, on this subject, said:

"That the state holds the title to the lands under the navigable waters of Lake Michigan, within its limits, in the same manner that the state holds title to soils under tide water by the common law, we have already shown, and that the title necessarily carries with it control over the waters above them whenever the lands are subjected to use. But it is a title different from that which the state holds in lands intended for sale. It is different from the title which the United States hold in the public lands which are open to pre-emption and sale. It is a title held in trust for the people of the state that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein freed from the obstruction or interference of private parties. The interest of the people in the navigation of the waters and in commerce over them may be improved in many instances by the erection of wharves, docks, and piers therein, for which purpose the state may grant parcels of the submerged lands; and, so long as their disposition is made for such purpose, no valid objections can be made to the grants. It is grants of parcels of lands under navigable waters that may afford foundation for wharves, piers, docks, and other structures in aid of commerce, and grants of parcels which, being occupied, do not substantially impair the public interest in the lands and waters remaining, that are chiefly considered and sustained in the adjudicated cases as a valid exercise of legislative power consistent with the trust to the public upon which such lands are held by the state. But that is a very different doctrine from the one which would sanction the abdication of the general control of the state over lands under the navigable waters of an entire harbor or bay, or of a sea or lake. Such abdication is not consistent with the exercise of the trust which requires the government of the state to preserve such waters for the use of the public. The trust devolving upon the state for the public, and which can only be discharged by the management and control of property in which the public has an interest, cannot be relinquished by a transfer of the property. The control of the state for the purposes of the trust can never be lost, except as to such parcels as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining."

See, also, Saunders v. N. Y. C. & H. R. R. R. Co., 144 N. Y. 75–85, 38 N. E. 992, 26 L. R. A. 378, 43 Am. St. Rep. 729.

[2] It must be manifest, therefore, that the owners of Strawberry Island acquired no title or ownership to the bed of Niagara river, or to the sand and gravel deposited, by virtue of their ownership of the uplands. Their title stopped at the high-water mark, or, rather, inasmuch as the tide does not ebb and flow in this river, to the mean water line of the stream. The decree entered in this action was far too broad

in its terms and provisions, and prohibited the doing of things which the court should not, in our opinion, enjoin. Nevertheless, so far as the parties to the action are concerned, it is undoubtedly binding.

It is claimed, however, by plaintiff's counsel that this action was to protect the southerly 15.55 acres of Strawberry Island, and the riparian rights appurtenant thereto, from the unlawful acts of the defendants and others, who, without the consent and against the protest of the plaintiff, were removing from the bed of the river material in such a manner as to undermine the banks of said island, and cause large portions to break off and sink into the river, thereby doing great damage to the plaintiff, and also interrupting the natural processes of accretion by which additions to said land were continually being made.

[3] It undoubtedly is true that the owners of the uplands would be protected against the acts of parties taking from the river material so immediately adjacent thereto as to take away its natural support, and cause it to fall into the river. The argument that this justifies the contention that, therefore, the plaintiff has the right to enjoin the taking of sand and gravel from the river bottom far out in the stream, does not follow. To endanger the banks of the island, the dredging or sucking up of sand and gravel from the river bed must be done approximately close to the shore. Certainly there is no suggestion in the affidavits read on this motion showing, or tending to show, that the removal of sand and gravel from the river bottom far out into the stream in the least injured or imperiled the banks of the island. All that is claimed by the plaintiff is that the particular act complained of was done at a point about 60 feet westerly of the center line of the river, which, judged from the maps, must have been in the neighborhood of 1,000 feet from the island. Certainly it cannot be fairly claimed that dredging at this distance in any manner endangered the banks of the island. It was not necessary to protect the banks that the injunction should restrain operations clear to the middle of the river.

[4] We are led to believe that the court would not have enjoined, without qualification, the removal of sand and gravel from the river bed had the defendants in this action contested the question, and not stipulated that judgment to that effect might be entered. Having voluntarily offered judgment, and agreed the decree in question might be entered against them, the defendants themselves are doubtless bound by its provisions. But the injunction decree can bind no one who is not a party to it, nor can it be deemed, under the circumstances, as establishing, or tending to establish, as against persons other than the parties to the action, any right in the plaintiff to remove sand and gravel from the river bed. This sand and gravel is clearly the property of the state of New York. Neither the plaintiff nor the defendants nor the James Harrigan Company, or any other person or party, as against the state of New York, has any right to these deposits, and without the license and consent of the state, have no technical right to remove and appropriate the same.

[5, 6] For the same reasons, the James Harrigan Company cannot be said to have any interest in the subject-matter of this litigation, which entitles it to be made a party to this action. The state, and the state alone, owns the fee of the bed of the river and the deposits made

thereon, subject always to the paramount right of the federal government to deepen and improve the channel, and make other improvements in the interest of commerce and navigation. Subject to these rights of the federal government, the state alone has the right to intervene, and assent to, or permit, the removal of the sand and gravel in question. The James Harrigan Company has no other or different standing as to the controversy, so far as the right to the sand and gravel is concerned, than any other citizen of the state. It asserts no grant or license from any state authority.

This leads us to the conclusion that the motion of the James Harrigan Company to vacate the judgment, and to intervene and defend this action, must be denied. It also leads necessarily to the conclusion that the motion to bring in the state as a party defendant must also be denied. This court has no power to bring in the state. The state cannot be sued, or brought into a suit. Whatever it does, it must do of its own volition.

[7] The decree is attacked as carrying out some arrangement or agreement claimed to be in violation of the federal and state anti-trust statutes. Conceding such to be the case, the moving parties are in no position to raise it in this action. If the parties have violated those statutes, the remedy is by separate action or criminal prosecution for their acts, and not by intervention in this.

[8] This brings us to the further consideration of the motion to punish for contempt. None of the parties sought to be punished are parties to the action, except the Perry Sand Company. The others were not bound by the decree of injunction. They cannot be punished for disobedience of the decree simply because the decree purported to restrain not only the defendants, but "all persons whomsoever, * * * though not named herein," for such parties have not had their day in court. None of the persons sought to be punished can be disciplined for disobedience of the decree, unless it be made to appear that they were in fact acting as the agents of, or in collusion with, the actual defendants.

[9] We are, however, satisfied from the affidavits that no violation of the injunction was intended by any one, if, in fact, committed. All the persons sought to be punished deny that any dredging was in fact done within prohibited lines. We recognize that it is possible they may be mistaken in this statement, just as it is possible the plaintiff's witnesses may be mistaken on their part as to the exact location of the tug and vessels doing the work. It goes without saying that it is not always easy to determine exact locations on the water. At most, all that is claimed is that the vessel complained of was some 60 feet over the line. Assuming such to have been the fact, we are satisfied the taking of gravel west of the center line of the river was accidental, and not intentional. But, even though sand and gravel were taken from the river bottom as claimed by the plaintiff, in that fact there is nothing calling for the court to punish for contempt even the Perry Sand Company. The unintentional violation of an injunction order presents no case for the court to vindicate itself or its decree. No case is presented for indemnifying the plaintiff or its assignee and grantee for loss, for they have suffered no damage, even though sand

and gravel have been taken from the river, because the parties have no exclusive property or rights in such sand and gravel.

For these reasons, the motions of all parties are denied, without costs to either as against the other. So ordered.