## THE CHAMPLAIN AND ST. LAWRENCE RAIL ROAD COMPANY *vs.* VALENTINE and MENDELSON.

The proprietors of land lying upon Lake Champlain, unless it is otherwise expressed in the grants, own to low water mark; subject to a servitude to the public, for the purposes of navigation, up to high water mark.

The proprietor of land on the bank of a river, where the tide flows, owns to high water mark; but above tide water, he takes *usque ad filum aquæ;* except, perhaps, when the stream is a navigable boundary. This rule, however, is not applicable to our North American lakes.

A grant of land under water, opposite and adjacent to the land of another, made by the commissioners of the land office, is void.

Recitals in a deed are evidence against the grantee. But they work no estoppel in a deed poll; nor where the allegations in the instrument are immaterial to the contract therein contained; nor where the action is not founded on the deed, but is wholly collateral to it.

Where a part of a lot is excepted out of a deed, the grantee is not estopped from setting up title afterwards acquired, to the excepted piece, and through a source hostile to the title of the grantor; although the clause containing the exception declares such piece " remains vested " in the grantor.

Forty years' possession is necessary to bar a suit by the people to recover real estate, where such possession commenced before 1830, although the suit was commenced after 1850.

And the rule is the same where the suit is brought by a grantee of the state, if, during the time relied upon, the title was in the state; and, it seems, in such cases, the statute should be pleaded.

Ejectment will lie for land under water, granted by the commissioners of the land office for the purpose of erecting docks &c., for commercial purposes.

Champlain and St. Lawrence Rail Road Co. *v.* Valentine.

But ejectment for entering and unlawfully withholding the possession of land, will not lie against a person who is not in possession himself or by his servant, though he has given a lease of it, and it is occupied by the lessee.

THIS action was tried before Mr. Justice HAND at the Clinton circuit, in February, 1852, and was brought to recover the possession of a store situated in the town of Champlain. It was commenced in November, 1851. In 1820 (or soon after) one McCollum built the store just upon the margin of Lake Champlain. The testimony was conflicting as to what portion of it was built below high water, and what below low water mark. It was admitted that it was built on the north half of lot No. 52 of the Canadian and Nova Scotia Refugee Tract, or just north of what would be a continuation of a line dividing the north and south moieties of the lot; which line ran a course south 79 deg. 45 min. E. The store was 24 feet wide and 36 feet long, standing one end toward the lake; and did not stand on a line with that dividing the lot; but the lake end extended out in a direction north-easterly. In 1844 McCollum, who was the owner of the north half of 52, conveyed that half of the lot to one Webb, excepting and reserving the store; and the plaintiffs derived title to this part of the same land from Webb by mesne conveyances. The reservation in McCollum's deed to Webb was, of a "certain building being and situate on the east corner of the south line of said north half of lot No. 52 to the east of the highway passing through said lot, and bounded by the waters of Lake Champlain on the east, with the land on which said building or store now stands; which building and land remains vested" in McC. The deed began, "This indenture" &c., and the last clause of it was, "In witness whereof the said party of the first part has hereunto set his hand and seal this day" &c. After the plaintiffs had acquired title as above to the north half of lot No. 52, and to some other lots and pieces along the lake, they applied to the commissioners of the land office, and obtained a grant of the lands under water adjacent and opposite to the lands on the shore, owned by them; and between parallel lines, that should be a continuation of the north and south lines

of said lots and pieces of land, describing them, and including this part of lot No. 52. The grant authorized the company to erect docks thereon, necessary to promote the commerce of the state ; and to erect a wharf or pier for the track of their rail road ; and granted certain other privileges, and imposed certain restrictions, which it is not important to notice ; and it declared that until the premises were actually appropriated and applied to the purposes of commerce, the people had the free right of entering upon and using the same. The plaintiffs claimed that there was no reservation in McCollum's deed of so much of the store as stood below high water mark ; or, if there was, by the terms of the deed, such reservation was void as against the state and its grantees. And that consequently, their grants of land under water covered all the land, including the store, *except what was opposite to that part of the store which was above high water mark.* It appeared that Valentine had leased the store to the defendant Mendelson, who was in possession, but Valentine was not. A verdict for the plaintiffs was taken subject to the opinion of the court at general term, and the jury also found specially, as follows :

" 1. We find a line running S. 79 deg. 45 min. E. intersecting with the line of ordinary high water mark, where the store rested upon it, at the most northerly part thereof when built, would pass through the store at a point 30 feet from the most northerly corner of the store ; for that part of the store northerly of such line we find for the plaintiff.

2. We find that such line as the line of ordinary high water mark was Aug. 12, 1851, would strike the store 33 feet from the most northerly corner thereof.

3. We find said line crossing the line of ordinary low water mark when the store was built, would strike the store ten feet from the most northerly corner.

4. And would strike the store at ordinary low water mark, on the 12th day of August, 1851, ten feet from the most northerly corner."

Some other facts will be found noticed in the opinion of the court.

Champlain and St. Lawrence Rail Road Co. *v.* Valentine.

*C. K. Averill,* for the plaintiffs.

*F. A. Hubbell,* for the defendant.

*By the Court,* HAND J.　I think the interest conveyed by these grants from the state, of land under water, is such that an action may be brought by the grantee to recover the possession.  Ejectment could have been maintained, under our former system, where a right of entry existed, and the interest was tangible, so that possession could be given.  (*See Jackson* v. *Buel,* 9 *John.* 298; *Jackson* v. *May,* 16 *id.* 184; *Co. Lit.* 5; *People* v. *Mauran,* 5 *Denio,* 389; *Adams on Eject.* 18; 2 *Bac. Ab.* 4, 17; 1 *M. & W.* 210; 15 *Barb.* 357, 8.)  This is a grant of land under water for certain specific uses and purposes, which require actual occupation.  The people may enter and use it as before, until so appropriated, but the plaintiff can never so use and apply it, or enjoy the right, so long as the land is wholly possessed by another and for another purpose.  Corporations may take and hold lands, unless restrained by their charter; and a rail road corporation may do so for purposes necessary to accomplish the objects of its incorporation.  (*Laws of* 1850, *ch.* 140, §§ 25, 28.　*Ang. & Ames on Corp.* 110.　2 *Kent,* 281. *McCartee* v. *Orph. Asy. So.* 9 *Cowen,* 437.)

The deed given by McCollum to Webb, expressly reserved this store, and, of course, his grantee could not claim it under that deed.  But if neither of them then had title to it, accepting the deed did not prevent Webb, or any one holding under him, from afterwards acquiring title to the excepted piece from some other source.  Although this deed, in form, began as an indenture, it purports to be, and is, in fact, the deed of, and executed only by, the grantor; and therefore has the quality merely of a deed poll.  (*See Toml. Dic. Deed; Cowell, Deeds;* 2 *Bl.* 296; 2 *Hill. Ab.* 280;) which does not estop the grantee in fee from denying that his grantor had title.  (*Sparrow* v. *Kingman,* 1 *Comst.* 242.　*Averill* v. *Wilson,* 4 *Barb.* 180.　*Osterhout* v. *Shoemaker,* 3 *Hill,* 518.)  Much less would it estop him from denying that his grantor had title to land excepted out of the

grant, and to the title to which, of course, he was thereby made a stranger. (*Carver* v. *Jackson*, 4 *Pet. R.* 83.) The exception or reservation in this deed, although an exception is said to be a part of the thing granted, (5 *Denio*, 607. 1 *Barb.* 407,) left the store as though it had not been part of that lot, or the description in the deed had not included it, or referred to it. (*Russell* v. *Scott*, 9 *Cowen*, 279.) A recital in a deed may be evidence against the grantee, (9 *Paige*, 659. 17 *Barb.* 109. 18 *id.* 20.) But works no estoppel where the allegations in the instrument are immaterial to the contract therein contained, or where the action is not founded on the deed, but is wholly collateral to it. (*Carpenter* v. *Butler*, 8 *M. & W.* 209. 1 *Saund.* 215, *n. b.*) Webb did not covenant that the store should "remain vested" in the grantor. That expression was used to make the exception clear and distinct.

This store was built in 1820, or soon after, and probably in 1820. The period of limitation, barring suits for land by the state, was then forty years. (1 *R. L.* 184, § 1.) In 1830 the period was reduced to twenty years. (2 *R. S.* 292, § 1.) But that, it seems, has no retroactive effect, where the statute began to run under the former law; although twenty years have elapsed since 1830. (2 *R. S.* 300, § 45. *People* v. *Arnold*, 4 *Comst.* 508. *Fairbanks* v. *Wood*, 17 *Wend.* 329. *Williamson* v. *Field*, 2 *Sandf. C. R.* 568, *et seq.* *Millard* v. *Whitaker*, 5 *Hill*, 408. 15 *Barb.* 184. *People* v. *Sup. of Col. Co.* 10 *Wend.* 363. And see *Huntington* v. *Brinckerhoff*, 10 *id.* 278 ; *McCormick* v. *Barnum*, 10 *id.* 104.). And especially when the possession was merely by acts constituting a nuisance. And besides, there is no plea that the people had not received the rents and profits, &c. within forty, or twenty years, as seems to be necessary within the case of *The People* v. *Arnold ;* though this may not be so in private suits, where the right of entry existed before the code, and the title had been in private hands during the alleged adverse possession. And if the statute must be pleaded when the state sues, I think the rule should be the same where the suit is brought by the grantee of the state, and the time ran while the title was in the state. So the consider-

Champlain and St. Lawrence Rail Road Co. *v.* Valentine.

ation of the statute does not fairly arise in this case.   Indeed, I understood the defendant's counsel to make no point upon that, except that the state had acquiesced in the occupant keeping the shore as it was when the store was built.

' The terms of the original grant from the state, under which all parties claim to hold, were not shown.   All the land in the state, *prima facie*, belongs to the people.   But the whole of lot No. 52 had been occupied more than forty years before this suit was commenced, and neither party objects, or can object, that there has been no grant, and I think we may presume it was bounded on the east by the lake ; and such is the language of the description of the land in some of the subsequent conveyances produced in evidence.

The grant to the plaintiffs, of land under water, makes no exception of what was opposite or adjacent to the store.   But if any person, other than the plaintiffs, was the proprietor of the store, or any part of it, the grant was so far void.   (1 *R. S.* 208, § 67.)   But it was only void to that extent.   So that, if the people owned all below high water mark, that was the eastern boundary of what McCollum reserved or excepted ; and he was not proprietor of so much of the store as stands below that line and north of an easterly and westerly line intersecting it.   Indeed, he had no title to any part of the store below high water mark.   (1 *Harg. Tracts*, 12, 13, 85.   *Gould* v. *Hud. Riv. R. Co.* 2 *Seld.* 522.)   But with so much of it as stands below or in front of what he did actually own, the plaintiffs have no concern. And if low water mark is the eastern boundary of the lot, the same principle will apply to that line.   But if the riparian owner, if that be a correct expression in reference to the possessor of the banks of a lake, (*see Thom. Mag. Carte*, 203 ; *Cowell*, "*Ripariæ*,") holds in this case to the center of the lake, in analogy to taking *usque ad filum aquæ*, in case of rivers, then the plaintiff must wholly fail.   This brings us to the principal question in the case : What is the true eastern line of lot No. 52 ?

It seems pretty well settled in this state, that a grant bounded upon a river generally, above tide water, takes to the thread of the stream ; subject to the servitude of the public interest,

liable to the use of the public for the purposes of navigation, where susceptible of such use. There are some opinions the other way; especially as to our large rivers; but the unanimous opinion of our highest court, in the case of the *Commissioners of the Canal Fund* v. *Kempshall,* (26 *Wend.* 404,) declares the integrity of the common law rule on this subject in this state, and I hope may be considered as settling the question. Perhaps it is otherwise if the stream be a national boundary. (17 *Wend.* 597. 3 *Kent,* 427. *Vattel, b.* 1, *ch.* 22. 12 *Barb.* 206.) The rights of the citizen, as well as those of the state, in such cases, usually depend in some degree upon treaty; and the sovereign cannot grant beyond the bounds of his territory. However, where the thread of a river not navigable, is the boundary between two states, and there are no stipulations in relation to its use, perhaps there is no reason why the common law rule should not prevail.

But it is contended that this principle does not apply to our lakes. And certainly, it would seem preposterous to make the application, to the full extent. Two islands in this lake, (North and South Hero,) which I believe, nearly constitute a whole county in Vermont, by this rule should belong to the proprietors of the main land. The first part of the treatise attributed to Lord Hale, *De Jure Maris, &c.* (1 *Harg. Tracts,*) has been pretty generally adopted in this country; and especially in this state. But, from the nature of things, in many particulars, it is not adapted to our lakes. The English have no large inland bodies of stationary fresh water, or even of salt, unaffected by the tides. Nor is there any thing similar to our great lakes, in those parts of the old world where the civil law has prevailed. The treatise of Lord Hale, mainly an embodiment of the common law on this subject, is confined to rivers, and to the sea proper, and its arms. He has stated the law with regard to these, with wonderful astuteness and accuracy. But, there being no lakes within the jurisdiction of the English courts, he had no occasion to refer to that branch of the subject, nor had he materials from which he could form opinions, or compile a treatise thereon. We may reason from analogy, but of course, we

cannot expect to find decisions made by the English tribunals upon questions that could not, there, very well arise. Although the point perhaps, has not been distinctly decided in this state, some of our judges and jurists have not hesitated to declare an opinion, that the law in relation to the rights of riparian owners on rivers, above the flux and reflux of the tide, does not prevail in respect to our large lakes. (3 *Kent*, 427, 429, *n*. 5 *Wend.* 447. 17 *Id*. 597, 621. 12 *Barb*. 206. *And see Bronson, J.* 20 *Wend.* 208.) No doubt the extent of the lake or body of water would have an influence in the construction of the grant. A navigable river would not probably pass, even by a grant extending on both sides of it, unless expressly included in a conveyance from some sufficient authority. Grants of land, in this state, have embraced within their limits, ponds, or what might be called small lakes ; many of which have also been included in the computation of the amount of land to be conveyed by the letters patent. But there can be no question in regard to a body of water of the size of Lake Champlain ; which covers an area probably of nearly a thousand square miles, including its islands, and is navigable nearly one hundred and fifty miles. The same principle would embrace Lake Superior, the largest body of fresh water in the world ; and larger than any other, salt or fresh, not an arm of the sea ; the Caspian excepted. And besides, except at the extremities, as a general thing, this lake has no *filum aquæ;* but is an expanse of still, deep water, in some places ten or fifteen miles in width. It is perfectly clear to my mind, that a grant of land bounded by this lake, does not extend to the middle of it.

The next question is, whether high water or low water mark is the boundary.

Lord Hale, in his sixth chapter, in speaking of the shores of the sea, says, there seems to be three sorts of shores, " according to the various tides, viz : the high spring tides, which are fluxes of the sea at those tides that happen at the equinoxials ;" which he says many times overflow ancient meadows and salt marshes, and the spring tides, which happen twice a month, at the full and the change of the moon ; and the ordinary tides which hap-

pen between the full and the change of the moon. The land washed by the two first, he considers as belonging to the subject; and that washed by the last—between high and low water mark —the shore crossed by the ordinary flux of the sea, as belonging to the king. (*Harg. Tracts*, 25, 6. And see *Id.* 12, 13; 3 *Kent*, 431; *King* v. *Smith*, *Doug.* 441.) This latter margin or belt, that is, between ordinary high water and low water marks, is what he denominates the shore of the sea. But Lake Champlain has no flux and reflux of the tide; but, like most other similar bodies of fresh water in this country, it is high and full in the spring when replenished by rains and melting snows; and, as the season advances, becomes low by the evaporation and efflux of its waters. The annual rise and fall, as proved in this case, must be several feet, probably five or six; and the diminution is gradual. A great deal of land, valuable for agricultural purposes, is necessarily overflowed in the spring, which of course can be of no use to the public for the purposes of navigation, after the waters recede. The land upon its shore or borders which is inundated in the spring, unlike that which is diurnally (or semi-diurnally) overflowed by the tide, gradually becomes dry and so remains for the season. Its condition perhaps bears some resemblance to that which Lord Hale says is overflowed by high spring tides, and which he says belongs, in England, to the subject and not to the king. It seems to me that, upon principle and sound reason, the proprietors on the borders of Lake Champlain must be deemed the owners to low water mark, unless otherwise limited by the terms of their grants. (*And see Walworth, Ch.*, 5 *Wend.* 447; *Handley, lessee,* v. *Anthony,* 5 *Wheat.* 374.) (a)

It follows, that McCollum, at the time he conveyed to Webb, owned all of the store above low water mark, as do those holding under him now. If the building is an obstruction or annoyance to the common passage by the public and to navigation, it may be a public nuisance. But that is a matter between those erecting or maintaining it there and the public, at least as to this

(a) As to what is the upper limit of the sea shore, owned by the crown, see *The Att'y Gen.* v. *Chambers,* and *Same* v. *Rees,* (27 *Eng. Law and Eq R.* 242.)

Champlain and St. Lawrence Rail Road Co. *v.* Valentine.

suit. The result is, that all that the plaintiff can recover is so much of the store as lies north of a parallel line where it intersects low water mark, and as that existed when the store was built. The lake, probably, has a little advanced, but I think, in analogy to the principle applicable to navigable rivers and arms of the sea, the owners of the shore had a right to stop the breach. It has been decided that, where the encroachment is gradual, and its progress imperceptible, the owner of the banks may lose his land. (5 *M. & W.* 327.  4 *B. & Cr.* 485.  5 *Bing.* 163. 3 *Kent,* 431.) But Lord Hale also says, it has been held that where land is swallowed up by the violence of the sea, if there "be reasonable marks to continue the notice of it; or, though the marks be defaced, yet if by situation and extent of quantity and bounding upon the firm land, the same can be known, though the sea leave this land again, or it be by art or industry regained, the subject does not lose his propriety." (*Harg. Tracts,* 15. *Dyer,* 326 *b.*  16 *Vin.* 575.) And this doctrine, I think, was impliedly admitted in the case of *Gifford* v. *Lord Yarborough,* in the house of lords. (5 *Bing.* 163.) And if he can reclaim and regain it in such a case, there can be no question that he may maintain his ground by actual occupancy as here, although the banks are washed away on each side and the water flows under the building in part.

But there can be no recovery against Valentine, although he is the landlord of the other defendant. The complaint charges that the defendants entered, and unlawfully withhold the possession from the plaintiffs, and there is no proof that he has entered or withheld the premises, or committed any wrong against the plaintiffs.

Judgment for the plaintiffs against Mendelson, according to the third special finding of the jury.

[SCHENECTADY GENERAL TERM, January 3, 1853. *Hand, Cady* and *C. L. Allen,* Justices.]