<hr/>

JACOB HITTINGER *vs.* THOMAS H. EAMES.

Middlesex.    Jan. 18, 1876. — Jan. 3, 1877.    COLT & ENDICOTT, JJ.,
absent.

By the law of this Commonwealth, great ponds, not appropriated before the Colony
    Ordinance of 1647 to private persons, are public property, the right of reasonably
    using and enjoying which for taking ice for use or sale is common to all, and in
    the water or ice of which the owners of the shores have no peculiar right, except
    by grant from the Legislature, or by prescription.

The Gen. Sts. *c.* 61, § 1, authorizing the forming of corporations for the purpose of
    cutting, storing and selling ice, and the Gen. Sts. *c.* 161, § 73, punishing malicious
    injuries of " any ice, upon any waters within this state, from which ice is or may be
    taken as an article of merchandise, whereby the taking thereof is hindered, or the
    value thereof diminished for that purpose," do not restrict in any degree the com-
    mon right of the public to the ice, or confer peculiar rights upon any corporations
    or individuals.

In 1841, the owners of all the lands lying around and bordering upon a great pond
    executed, in accordance with an award to which they alone were parties, an inden-
    ture, containing a recital that they were " the lawful proprietors in fee simple of
    all the lands covered by the waters of said pond, and of said waters, and all the
    privileges and appurtenances thereof, in proportion to their respective interests in
    the margin of said pond ; " and by which they mutually agreed to divide " the sur-

face of said pond, and the waters thereof and the land under the same," among themselves in fee, according to certain lines therein defined ; and made mutual re-leases accordingly, with covenants for the quiet enjoyment by each party of the shares and portions of the premises to him so assigned and set out. In 1847, one of these owners made a conveyance of a parcel of land bordering upon the pond, " excepting and reserving to the grantor, his heirs and assigns, the exclusive right to take ice from said pond, which has heretofore pertained to said parcel of land, according to said indenture ; " and the grantee, in 1872, conveyed this parcel to the defendant, reserving the same rights to the first grantor. In 1865, the first grantor conveyed to the plaintiff the right so reserved. Since 1839 the proprietors of lands adjoining the pond had been in the practice of cutting and storing ice for sale. After the indenture, lines were drawn, whenever the pond was frozen, separating each proprietor's privilege from the others, according to the lines defined in the indenture, and the proprietors were accustomed to flood the ice with water in order to increase its thickness, and conformed to those lines in prepar-ing and cutting ice, and in conveyances which they made of land under the pond. No persons other than those employed by the proprietors ever came upon the pond to cut ice, and fishermen, who occasionally came to cut holes in the ice in order to fish, were not allowed to do so. The whole pond was much frequented by skaters, but it did not appear that they interfered with the ice-cutting in any way. When the pond was not frozen, fishermen and others went to all parts of it in boats. *Held*, that a bill in equity to restrain the defendant from cutting ice on the pond could not be maintained by the plaintiff, either by virtue of ownership of the shore of the pond, or of title by disseisin, or of any covenant or contract made by or binding upon the defendant, or of any restriction imposed upon him or his estate.

BILL IN EQUITY to restrain the defendant from cutting ice in Fresh Pond. The case was heard on the pleadings and proofs before *Ames*, J., who reported it to the full court in substance as follows :

Fresh Pond contains about one hundred and eighty-three acres, and the plaintiff and those under whom he claims and whose estate he possesses have annually, for more than fifty years, cut and taken ice from the surface of the pond, as an article of merchandise, and the right of the plaintiff, if he has any, to cut and take ice, was and is of great value.

In 1840, disputes arose among the owners of the entire shore of the pond, and of all lands bounding thereon, concerning the length and direction of their division lines in the pond, and their several rights to cut ice on the pond, and they submitted all such matters in dispute to the adjudication of three arbitrators ; and all the owners, having any legal or equitable interest in the shores of the pond, made an indenture, dated November 18, 1841, dividing among themselves the surface of the pond, according to the award; and a plan of the pond, and the waters thereof so

divided, was then made, defining the respective lines of said proprietors or owners under the award and indenture.

The indenture, after naming the parties to it, began thus: " Whereas the parties aforesaid, being owners in fee simple of the lands lying around and bordering upon the pond called Fresh Pond, situated in said towns of Cambridge, West Cambridge and Watertown, are also the lawful proprietors in fee simple of all the land covered by the waters of said pond, and of said waters, and all the privileges and appurtenances thereof, in proportion to their respective interests in the margin of said pond, the water whereof has of late years become very valuable for the ice it affords ; but doubts have arisen as to the manner in which said parties are entitled to enjoy their several rights therein. Now for the final settlement of such doubts, and for defining with greater precision the local extent of the said rights of the parties aforesaid, they have mutually agreed that the surface of said pond, and the waters thereof and the land under the same, be divided among themselves in the manner hereinafter set forth, and that the several interests and territorial limits of the property of said proprietors in the premises justly and lawfully are, and shall henceforth be used and enjoyed by them and their heirs and assigns forever, by the lines and in the form here following."

Then followed a description of the various parcels, and the following mutual release and covenant : " And each one of said parties, in consideration of the sum of one dollar to him paid by the others, doth hereby remise, release and forever quitclaim to each of the others aforesaid, severally, all his own right, title, interest and claim in and to that portion of the premises assigned and set out to each of said other parties respectively in manner aforesaid. And each one of said parties doth by himself, and for himself, his heirs and assigns, hereby covenant to and with each and all of the others of said parties, both jointly and severally, and their respective heirs and assigns, that they, the said covenantees, their heirs and assigns, shall and may from henceforth forever respectively well and peaceably have, hold, possess, occupy and enjoy all the shares and portions of said premises to each of them respectively and severally assigned and set forth as aforesaid, without let, suit, eviction or any trouble or molestation whatsoever from said covenantor or his heirs or assigns

or any of them, or of or from any other person or persons lawfully claiming under him or them, or any of them."

Nathaniel J. Wyeth was an owner of several parcels of land on the shores of the pond, and on July 9, 1847, conveyed to S. L. Wildes one of these parcels, called the Hayward Pasture, bounding it upon the pond, by a deed containing the following clause : "Excepting and reserving however to myself, the said Wyeth, my executors, administrators and assigns, the ice-house now standing on the tract of land first above described, but not a right of way thereto across said land ; excepting also and reserving to myself, the said Wyeth, my heirs and assigns, the exclusive right to take ice from said Fresh Pond, which has heretofore pertained to said first above described parcel of land according to " the indenture before mentioned. A portion of the premises conveyed to Wildes passed by various mesne conveyances to the defendant in 1872, each of the deeds containing an exception and reservation to Wyeth, his heirs and assigns, of the exclusive right to take ice from Fresh Pond which had pertained to said parcel of land according to the indenture, and referring to that deed.

After the death of Wyeth, his widow, to whom he devised all his real estate, conveyed to the plaintiff, on September 13, 1862, a parcel of land bordering on the pond, " together with all that part or portion of said Fresh Pond, which appertains or belongs to the said premises, however bounded or described, or which belonged to the said Nathaniel J. Wyeth at his death, and all his rights in or to said pond, to cut ice thereon or of any other nature ; also all the rights to cut ice in said pond, which appertained to an estate on the southwest side of said pond, formerly owned by said Nathaniel J. Wyeth, called the Hayward Pasture, and which rights were reserved by him in a deed of said estate to one Wildes, dated July 9th, A. D. 1847."

Since the date of the indenture the various parties thereto and their heirs and assigns (including Wyeth and the plaintiff) have acquired the estates, right and property, apportioned to them respectively by the indenture, by an uninterrupted, adverse, exclusive and undisputed possession ; provided the facts hereinafter set forth are sufficient in law to make out and establish such a possession, but not otherwise.

In 1839, if not earlier, the proprietors of lands adjoining the pond had been in the practice of cutting and storing ice, and the indenture was executed for the purpose of defining their rights in reference to each other and of establishing limits which they were to observe. Every season, as soon as the ice became hard enough, stakes were set up to mark out the lines separating each proprietor's privilege from the others, according to the lines defined in the indenture; and it appeared that those lines were conformed to in the cutting by all parties. It sometimes happened that one proprietor, not having occasion to take all the ice within his limits, would sell what remained, as it lay, to an adjoining proprietor. The practice was, before cutting, to scrape off the snow, so that, in addition to the rows of stakes, the different lots were usually separated by a ridge, more or less high, of snow. It was common, also, in the language of the witnesses, to " cultivate " the ice, a term which was defined to mean to increase its thickness by cutting holes through which the surface of the ice was flooded, and snow upon the surface was melted and remained to be frozen.

The ice was generally cut to be shipped, but there was also a large local demand, which was supplied by the proprietors under the indenture or their lessees. The business was on a very large scale, employing sometimes over a thousand men, with horses and machinery; and the season for cutting usually lasted about three months. The men employed came generally from places within six miles from the pond. Hundreds of spectators visited the place to witness the cutting of the ice.

No other persons except such as were employed by the proprietors ever came upon the pond to cut ice. Fishermen occasionally came upon the ice intending to cut holes in order to fish, and there was evidence that they were forbidden to do so, and that they thereupon gave up the attempt; also that notices, forbidding such encroachments, were conspicuously posted at various places upon the banks of the pond. At all times when the pond was not frozen, fishermen and others went to all parts of it in boats.

The pond was largely resorted to by skaters, who made use of such places as they could find suitable for their sport, without regard to any division of the surface, but it did not appear that

they interfered with the ice-cutting in any way. It also ap-
peared that the agent of the Union Railway Company caused a
portion of the surface of the ice to be cleared in order to accom-
modate skaters, but this was done upon application to and by
consent of some adjoining proprietors, and with scrapers and
machinery borrowed of them.

The plaintiffs offered in evidence, and were permitted to use, a
large number of leases and other written papers, for the purpose
of proving that these privileges, as given or provided by the in-
denture, were recognized and bought and sold as valuable prop-
erty. These deeds generally purport to convey land in fee or for
terms of years covered by water and being parts of the land un-
der the waters of said pond, and bounded by and in conformity
to the lines laid down in said partition according to the plan.
The defendant objected to these papers, on the ground that some
of them had not been recorded in the public registry; but they
were admitted, for the purpose aforesaid, subject to the defend-
ant's exception.

The defendant, at the time of the filing of the bill, was pro-
ceeding to erect, and has since erected upon the parcel of land
conveyed to him, a large building or ice-house, capable of con-
taining three thousand tons of ice, for the purpose of there stor-
ing ice, cut from the pond as an article of merchandise, and had
entered upon the pond, and cut therefrom to sell, as an article
of merchandise, three thousand tons of ice, and he intends to
continue so to cut, store and sell.

The case was reserved for the consideration of the full court,
such decree to be rendered as to the court might seem meet.

*C. T. Russell & N. St. J. Green,* for the plaintiff. 1. The
Colonial Ordinance of 1647 does not keep the title in the soil of
great ponds in the Commonwealth. Riparian proprietors have
a peculiar title in the land, and in the ice, which, when formed,
becomes part of the land. Gen. Sts. *c.* 61, § 1; *c.* 161, § 73.

2. The plaintiff has acquired title to the land and to the water
of the pond adjoining the defendant's premises, by disseisin, as
against him and his grantors, by an uninterrupted, exclusive and
undisputed possession for more than thirty-three years; and has
acquired, as against the defendant, an exclusive right to the ice
upon that portion of the pond by prescription. *Nichols* v. *Boston,*

98 Mass. 39, 42. *Tufts* v. *Charlestown*, 117 Mass. 401. *Tudor* v. *Cambridge Water Works*, 1 Allen, 164. Angell on Tide Waters, *c.* 9, and cases cited.

3. The defendant is estopped, by the deeds under which he claims title, from asserting any right to cut and take ice as against the plaintiff. The covenants in the indenture of 1841, and in the deeds under which the defendant claims title, in their terms and by their nature, run with the land, and restrict and limit its use. 2 Washb. Real Prop. (4th ed.) 286. *Spencer's case*, 5 Rep. 16. *Bronson* v. *Coffin*, 108 Mass. 175. The covenants are of mutual benefit to the covenantors and future assigns, and so run with the land. *Savage* v. *Mason*, 3 Cush. 500. *White* v. *Whitney*, 3 Met. 81. *Morse* v. *Aldrich*, 19 Pick. 449. *Trull* v. *Eastman*, 3 Met. 121. *Sharp* v. *Ropes*, 110 Mass. 381. *Linzee* v. *Mixer*, 101 Mass. 512. There is privity of estate between the defendant and the original covenantor, Nathaniel J. Wyeth, who is his grantor. *Hurd* v. *Curtis*, 19 Pick. 459. The defendant took his estate, knowing and acknowledging the existence of the covenant and restriction upon it. The land was bound by a restriction against the right to cut ice on the pond, except on a designated place, upon which designated place Wyeth had the right to cut ice. This right was conveyed by the devisee of Wyeth to the plaintiff. The defendant afterwards, as grantee, accepts a deed in which the right of cutting ice is expressly reserved, made a burden upon the granted premises, and is thereby estopped to deny its existence. Bigelow on Estoppel, (2d ed.) 277, 283. He cannot use this land so as to defeat the reservation, which created in Wyeth the sole right to cut ice from this estate. *Goodrich* v. *Burbank*, 12 Allen, 459. *Bowen* v. *Conner*, 6 Cush. 132, 137. *De Witt* v. *Harvey*, 4 Gray, 486. Such a reservation of right to cut ice was valid, and is the subject of grant, independently of the ownership of any estate to which it was appurtenant. *Goodrich* v. *Burbank*, 12 Allen, 459. *De Witt* v. *Harvey*, 4 Gray, 489. *Owen* v. *Field*, 102 Mass. 90. *Bailey* v. *Stephens*, 12 C. B. (N. S.) 91. *Buffum* v. *Harris*, 5 R. I. 243.

4. But it is immaterial whether the indenture of 1841 created covenants running with the land. Being a covenant restricting the use of property, it will be enforced in equity in favor of a

party in interest, against a purchaser of such property, having notice of it. *A fortiori*, it will bind a party taking subject by expression or implication to it. *De Mattos* v. *Gibson*, 4 De G. & J. 276, 282. *Wilson* v. *Hart*, L. R. 1 Ch. 463. *Leather Cloth Co.* v. *Lorsont*, L. R. 9 Eq. 345. *Western* v. *MacDermott*, L. R. 2 Ch. 72. *Carter* v. *Williams*, L. R. 9 Eq. 678. *Tulk* v. *Moxhay*, 2 Phillips, 774.

5. If it be contended that the defendant cannot be restrained from cutting ice, because the cutting of ice is a public right, "What is said in 2 Shower, 351, *The Company of Taylors* against *Clarke*, seems to be the substance of everything which can be said on this subject, viz., ' Whatsoever a man may lawfully forbear, that he may oblige himself against, except where a third person is wronged, or the public is prejudiced by it.' " *Low* v. *Peers*, Wilmot, 364, 377.

*G. W. Park & G. F. Piper*, for the defendant.

GRAY, C. J. By the law of Massachusetts, great ponds, not appropriated before the Colony Ordinance of 1647 to private persons, are public property, the right of reasonably using and enjoying which, for taking ice for use or sale, as well as for fishing and fowling, boating, skating, and other lawful purposes, is common to all, and in the water or ice of which, or in the land under them, the owners of the shores have no peculiar right, except by grant from the Legislature, or by prescription, which implies a grant. Anc. Chart. 148. *Cummings* v. *Barrett*, 10 Cush. 186. *West Roxbury* v. *Stoddard*, 7 Allen, 158. *Paine* v. *Woods*, 108 Mass. 160, 169, 173. *Commonwealth* v. *Vincent*, 108 Mass. 441, 446. *Fay* v. *Salem & Danvers Aqueduct*, 111 Mass. 27.

Neither the Gen. Sts. *c.* 61, § 1, authorizing the forming of corporations for the purpose of cutting, storing and selling ice, nor the Gen. Sts. *c.* 161, § 73, punishing malicious injuries of "any ice upon any waters within this State, from which ice is or may be taken as an article of merchandise, whereby the taking thereof is hindered, or the value thereof diminished for that purpose," restrict in any degree the common right of the public, or confer peculiar rights upon any corporations or individuals.

It appears by the report that in 1841 the owners of all the lands lying around and bordering upon Fresh Pond executed, in

accordance with an award to which they alone were parties, an indenture, containing a recital (of the truth of which there is no other evidence) that they were "the lawful proprietors in fee simple of all the land covered by the waters of said pond, and of said waters, and all the privileges and appurtenances thereof, in proportion to their respective interests in the margin of said pond;" and by which they mutually agreed to divide "the surface of said pond, and the waters thereof, and the land under the same," among themselves in fee according to certain lines therein defined, and made mutual releases accordingly, with covenants for the quiet enjoyment by each party of the shares and portions of the premises to him so assigned and set out.

The evidence stated in the report falls far short of showing such uninterrupted, adverse, exclusive and undisputed possession or enjoyment, as is necessary to establish a private title by prescription, to the exclusion of a common right in the public. At all times when the pond was not frozen, fishermen and others went to all parts of it in boats, and there was no apparent division or exclusive occupation whatever. Even while the pond was frozen, the only persons who appear to have been excluded from the lawful exercise of their common rights were a few fishermen. For skating, which would seem by the report to have been the principal purpose, other than the cutting of ice, for which the pond was resorted to in the winter, the whole surface was freely passed over. It does not appear that any one, who wished to cut ice for use or sale, was prevented from doing so. The actual cutting of ice by the parties to the indenture was no more than they had a right to do in common with the whole public; and the fact that these parties, in the preparation and cutting of the ice, and in making leases and conveyances, conformed to the conventional lines upon which they had agreed, has no tendency to prove that they had acquired any right by disseisin in the soil of the pond, or in the waters thereof, or in the ice formed therein.

The cases cited by the learned counsel for the plaintiff are quite distinguishable. In *Tudor* v. *Cambridge Water Works*, 1 Allen, 164, the decision was upon a demurrer which admitted the plaintiff's title. In *Nichols* v. *Boston*, 98 Mass. 39, and *Tufts* v. *Charlestown*, 117 Mass. 401, the flats in question were inclosed by permanent structures which excluded the public.

The only covenant in the indenture of 1841 is a covenant for quiet enjoyment of the portion thereby set off and released to each party. The benefit of that covenant would doubtless pass to his assigns. *White* v. *Whitney*, 3 Met. 81. But the burden of the covenant did not run with the lands or rights owned by or set off to the covenantors, so as to bind their assigns, because, so far as such lands or rights were by the side of the pond, the covenantee never had any interest in them, and, so far as they were within the pond, the covenantee expressly released all his title, and he had therefore no interest in any such lands or rights, whether within or without the pond, and no privity of estate with a purchaser thereof. *Bronson* v. *Coffin*, 108 Mass. 175, 180, and 118 Mass. 156, 162.

But the deed of . Wyeth to Wildes, whose title the defendant has since acquired, conveyed nothing but a lot of land by the side of the pond, the grantor's title in which was anterior to and independent of the indenture. The deed contains no undertaking or promise on the part of the grantee, which could bind him by way of covenant or of contract. The clause of reservation imposes no restriction on the use of the land granted, as in *Peck* v. *Conway*, 119 Mass. 546. It simply purports to except and reserve to the grantor, his heirs and assigns, such right to take ice upon the pond, as pertained to this land under the indenture.

The defendant has not undertaken to exercise any such right, but denies that it exists. Never having himself admitted any such right, and not being a party to the indenture, nor deriving or claiming any title or interest under it, he is not estopped to assert and exercise the right of taking ice from the pond in common with any of the public who can gain access to it without trespassing upon the lands of others.

The result is, that the plaintiff has shown no right to maintain this bill, either by virtue of ownership of the shore of the pond, or of title by disseisin, or of any covenant or contract made by or binding upon the defendant, or of any restriction imposed upon him or his estate, which can be enforced in equity

*Bill dismissed, with costs.*