MARY M. GOUVERNEUR et al., Respondents, *v.* THE NATIONAL ICE COMPANY, Appellant.

134   355
78 AD¹523

The presumption in this state is that lands under the waters of small inland non-navigable ponds and lakes belong to the proprietors of the adjoining lands, and the same rule applies in the legal construction of grants of land bounded on them as is applied to conveyances bounded on fresh water streams.

Unless restricted, therefore, by express words, or by other facts implying a contrary intent, a conveyance of land adjoining such a lake or pond describing it as running "to the pond," or to some monument on the land at the water and thence along the pond to some other monument on the bank, carries the title to the center of the pond, and the fact that the lines along the pond are described by courses and distances running to and from monuments on the bank, and that the length of the line given is the distance between the monuments is no evidence of an intent to restrict the grant so as to exclude the bed of the pond.

Where, therefore, the owner of lands containing a small lake or pond covering about forty-five acres, conveyed to different grantees all the lands adjacent to and surrounding the pond, the deeds giving courses and distances, one giving the lines as running to the "pond near a large rock, thence northerly along said pond;" another, "to a birch sapling marked on the east side" of the pond, "thence south * * * along the pond;" another giving the courses and distances of different lines "along" the pond; another, "beginning near the north side of a large rock on the west side" of the pond, running thence a specified course

and distance "along said pond;" another, "beginning at a maple marked by said pond, thence north * * * along said pond," *held,* that the grants ran to the center of the pond; and that together the grantees took title to the whole thereof.

*Wheeler* v. *Spinola* (54 N. Y. 377); *Canal Commissioners* v. *People* (5 Wend. 423); *Champlain, etc., R. R. Co.* v. *Valentine* (19 Barb. 484), distinguished.

The authorities upon the subject in other states collated, and the reason for a different rule in Massachusetts and others of the New England states pointed out.

Reported below, 57 Hun, 474.

(Argued June 3, 1892; decided October 1, 1892.)

APPEAL from order of the General Term of the Supreme Court in the second judicial department, made September 8, 1890, which reversed a judgment in favor of defendant entered on a decision of the court on trial at Special Term and granted a new trial.

This was an action of ejectment, brought in January, 1883, to recover the possession of certain premises consisting of water and land under water of a natural pond or lake known as Hinckley pond or Croton lake, situated in the town of Patterson, county of Putnam, and is about 2,500 feet in length and 800 feet in width in the broadest place, and covers forty-five acres. Two streams, constituting its surface inlets, enter it at the southerly end. The outlet at the north end is known as Muddy brook.

The pond is within a tract of land granted June 17, 1697, to Adolph Phillipse by William III, King of England, by letters patent, which embraced the present Putnam county.

The plaintiffs by descent and as successors in interest of the patentee, who died intestate seized of the premises in 1749, have title to them unless it has in the meantime been alienated or otherwise defeated.

The plaintiffs' ancestors by five deeds of dates January 13, 1796, February 6, 1813, March 9, 1813, May 1, 1828, and September 30, 1845, conveyed all the lands surrounding and adjacent to the pond to grantees therein mentioned.

The several deeds respectively described parcels of lands and mentioned the quantities embraced within the boundaries;

and the following are the only portions of the descriptions given by the said conveyances in the order of their dates essential to the questions here for consideration.

In the first : " Thence north sixteen degrees west forty-three chains and seventy-nine links to Muddy brook, and down the same as it runs until it bears due west," etc. This first mentioned course intersected the pond some distance southerly from what now appears to be the outlet.

In the second : " Thence south eighty-one degrees east five chains  *   *   *   to Hinckley pond near a large rock; thence northerly along said pond to the outlet thereof, that is, to Muddy brook."

In the third : " Thence running north nineteen degrees west fourteen chains forty links   *   *   *   to a birch sapling marked, on the east side of Hinckley pond; thence south thirteen degrees west three chains twenty-six links along said pond; thence south seven degrees fifteen minutes west seven chains sixty links along do; thence south thirty minutes west two chains along do; thence south five degrees east two chains along said pond; thence south fourteen degrees, fifteen minutes east two chains, ninety-five links along do to a bunch of basswood sprouts marked at Abiol Crosby's corner."

Another description in the same deed : " Thence nine degrees thirty minutes east ten chains eighty-eight links along Abiol Crosby to a bunch of basswood sprouts marked, then due west one chain along Hinckley pond; thence south sixty-five degrees west four chains along do; thence south thirty-seven degrees west five chains eighty-five links along do; thence north seventy-one degrees thirty minutes west six chains eighty-eight links along do to the brook leading in said pond."

In the fourth : " Beginning near the south side of a large rock on the west side of Hinckley pond   *   *   *   ; thence running south sixteen degrees west five chains sixteen links along said pond."

In the fifth : " Beginning at a stake in a swamp south of Hinckley pond; " thence several courses and distances, then north sixteen degrees, east six chains, forty-eight links " to a

maple marked by said pond; then north sixty degrees west four chains ninety links along said pond to the beginning."

About 1,200 feet in length of the northerly portion of the premises in question lies along the two courses of the lines so given in the first two deeds, and the balance about 1,300 feet in length of the southerly portion of them is between the lines so described as along it in the last three deeds. Through those five deeds and sundry mesne conveyances the defendant took title to uplands adjacent to and surrounding the whole of the pond except a portion at the northeasterly corner formerly owned by one William Merritt, and such rights as the New York and Harlem Railroad Co. acquired to a strip along its west shore. In 1850 and 1851 William Merritt, who then had title to a portion of the upland, conveyed to the predecessors of the defendant all his interest in the premises in question. And, in 1850 and 1851 the defendant's predecessors filled in a portion of the pond, built an ice house thereon and provided some other appliances for gathering ice. After the construction of the New York and Harlem railroad, and in the winter of 1850 and 1851, the defendant's predecessors commenced gathering ice there and shipping it to market on the railroad. This was done every year thereafter, unless the winter of 1853 and 1854 may be excepted. And the defendant having acquired its interest there in 1867, then made preparations for the business of gathering ice from the pond and storing it for shipment and market, and erected buildings and provided means and facilities for such business, which it has since then carried on quite extensively there. The trial court found that the plaintiffs had no title to and were not entitled to the possession of the premises, and refused to find that by the lines as defined in the deeds of the parcels of land around and adjacent to the lake excluded the premises in question from the conveyances, and directed judgment for the defendant.

*Calvin F. st* for appellant.

*Eugene Frayer* for respondents.

BRADLEY, J. The defendant alleges several defenses, and the one founded upon the denial of the plaintiffs' title is that their ancestors conveyed the premises in question by deeds to certain grantees many years before this action was commenced. If this proposition of fact is sustained the other alleged defenses will require no consideration.

The premises which are the subject of controversy consist of a body of water formerly known as Hinckley pond and later as Croton lake, and land under the water situated in the town of Patterson, county of Putnam. This is a natural pond or lake about one hundred and fifty-one rods in length, and in the broadest place about forty-eight rods in width, and covers about forty-five acres. It has two inlets at the southerly end, and an outlet known as Muddy brook at the north end, and the court found that there was a slight and very sluggish current running through the pond from south to north. The plaintiffs do not claim title to any of the land adjacent to the lake, as that was all conveyed by their ancestors by five deeds made in the years 1796, 1813, 1828 and 1845. Natural ponds and small lakes are private property. They pass by grant of land in which they are included. They are also presumed, if nothing appears to the contrary, to belong to the riparian owners. And there would seem to be no substantial reason for the application of a different rule in the legal construction of grants of land bounded on them than is applied to conveyances bounding premises on fresh water streams. Our attention has been called to no case in this state where the question has arisen and essentially been the subject of determination.

In *Canal Commissioners* v. *People* (5 Wendell, 547) and in *Canal Appraisers* v. *People* (17 id. 597) the chancellor said : " The principle itself does not appear sufficiently broad to embrace our large fresh water lakes or inland seas, which are wholly unprovided for by the common law of England," and that a different rule must probably prevail as to them, " and also as to those lakes and streams which form the natural boundaries between us and a foreign nation."

A like remark was made in *Smith* v. *City of Rochester* (92

N. Y. 463) by Judge Ruger, who added: "We have arrived at the conclusion that all rights of property to the soil under the waters of Hemlock lake were acquired by and belong to its riparian owners." Hemlock lake is about seven miles long and a half-mile in width. And the fact that the title to the land in western New York, within which is Hemlock lake, was not derived from this state, was not deemed and is not important upon the question of its proprietorship, because it came within the class of small lakes the bed of which is the subject of private ownership.

In *Ledyard* v. *Ten Eyck* (36 Barb. 102) it was held that land conveyed by deed bounding it on Cazenovia lake, which was five miles long and three-fourths of a mile in width, extended to its center. But the conclusion reached in that case may have been supported upon another ground, which was there considered.

In *Wheeler* v. *Spinola* (54 N. Y. 377) the question was considered in its application to a pond, the size of which does not appear; and it was there said that "a boundary upon it does not carry title to its center, but only to low-water mark. Such is the rule as to boundaries upon natural ponds and lakes," and in support of the proposition are there cited *Canal Commissioners* v. *People* (5 Wendell, 423); *Champlain, etc., R. R. Co.* v. *Valentine* (19 Barb. 484); *Waterman* v. *Johnson* (13 Pick. 261); *Bradley* v. *Rice* (13 Maine, 198).

In the commissioners' case the relator claimed certain rights in the Mohawk river, which he alleged were impaired by the plaintiffs in error; and the railroad company case had relation to alleged rights in Lake Champlain, which is a large navigable lake about one hundred and thirty miles in length, and varying from about fifteen miles to less in width. This is a large navigable lake, and the Mohawk has been held to be a public river. Those two cases seem to have no necessary application to the present one. Reference further on is made to the other two cited cases.

The controversy in *Wheeler* v. *Spinola* had relation only to a strip of land between high and low-water mark on the south

side of Flax pond, upon which strip the defendant was charged with committing trespass in cutting thatch; and as the title under which the defendant claimed was by deed bounding the land upon the pond, it was held to extend to low-water mark. This covered the *locus in quo*, and was as far as the court was called upon to go for the purposes of the defense. While the views of the learned judge, upon whose opinion that case was decided, are entitled to much weight, the question now under consideration was not there necessarily considered or determined. And so far as we are advised it remains in this state an open one for consideration. There is a conflict of authority upon the subject by adjudication in some of the other states. And in holding that by conveyances bounding lands on natural ponds, the grantees take title only to low-water mark Massachusetts seems to have taken the lead. (*Waterman* v. *Johnson*, 13 Pick. 261.) That case was decided in 1832. There was a reason for such rule in that state in the fact, that by a colonial law or ordinance adopted in 1641, and amended in 1647, great ponds, which were defined as those containing more than ten acres, were declared public property, and after this ordinance was so amended in 1647, such ponds have not been subject to private ownership. (*West Roxbury* v. *Stoddard*, 7 Allen, 158; *Hittinger* v. *Eames*, 121 Mass. 539.) And after referring to *Ledyard* v. *Ten Eyck* (36 Barb. 102), and to what was there held in relation to the proprietorship of Cazenovia lake, Mr. Justice HOAR, in the *West Roxbury* case added that the state of New York had no statute similar in its provisions to the Massachusetts ordinance before mentioned.

In *Bradley* v. *Rice* (13 Maine 198, 29 Am. Dec. 501), decided in 1836, the question was not discussed, but the court said that no case had been cited or found where the rule of construction applicable to boundaries on streams had been extended to a pond or lake, and cited *Waterman* v. *Johnson*, to the contrary. It is unnecessary to refer to the relation to the colony and state of Massachusetts of the territory constituting the state of Maine up to the time of its admission

as a state into the Union, as such previous relation may be entitled to no consideration from the time it became a state.

In the *State* v. *Gilmanton* (9 N. H. 461), the question was whether the town of Gilmanton was chargeable with repairs of a bridge over what may be termed the outlet of Winnepissiogee lake, and that was said to be dependent on the fact whether the place crossed by the bridge was a river or bay. It was the boundary of the town; and it was accordingly held that if a river, the line of the town would go to the center, and only to the water's edge if a bay. This question of fact was reserved for trial. The cases cited in support of the proposition were *Ex parte Jennings* (6 Cow. 518) and *Canal Commissioners* v. *People* (5 Wendell, 423). And the court there added that such seems to have been the legislative construction in that state of grants bounding land on lakes and ponds as appears from the annexation of islands to the towns adjacent, etc.

In *Kanouse* v. *Stockbower* (48 N. J. Eq. 42), it was held that the line bounding the land on the pond or lake was in terms confined to the edge of it, and for that reason, as well as in construction of law, the land devised embraced none under the water nor any beyond low-water mark. The proposition that the rule applicable to boundaries on fresh-water streams does not apply to lakes or ponds, was held in *Boorman* v. *Sunnuchs* (42 Wis. 233) and *Diedrich* v. *N. W., etc., Ry. Co.* (Id. 248). And the same in *Trustees of Schools* v. *Schroll* (120 Ill. 509; 60 Am. Rec. 575). In *Fletcher* v. *Phelps* (25 Vt. 257), there was really no question that the boundary of the land on Lake Champlain was other than at low-water mark. And the court referring to the rule relating to boundaries of land on a fresh-water stream added that a different rule prevails where land conveyed is bounded on *large* natural ponds or lakes, and cites the *Waterman* and *Canal Commissioners* cases. The determination of some of the cases above cited is founded upon the proposition that the riparian owners do not have titles to lakes and ponds. And in *Paine* v. *Woods* (108

Mass. 169), Mr. Justice GRAY said that "the question whether the title in the land under a great fresh-water pond or lake is in the proprietors of the lands adjoining, or in the crown, does not seem to have been ever judicially determined in England and cites *Marshall* v. *Ulleswater Steam Navigation Co.* (3 B. & S. 732) where the question whether the soil of lakes *prima facie* belongs to the riparian owners on either side *ad filum aquæ,* or whether it belongs *prima facie* to the king was raised and undetermined. But later, it was held that the right to the soil of nontidal lakes was not necessarily in the crown. (*Bristow* v. *Cormican,* 3 App. Cas. 641 ; 24 Moak, 431.) Whatever may be the doctrine applicable to small inland lakes and ponds elsewhere, the presumption in this state is that the land under their waters belongs to the proprietors of the adjoining lands. (*Smith* v. *City of Rochester,* 92 N. Y. 463.) Such is the common-law rule in the states where the grantees of land so situated and described by boundary in grants as on or along such waters, take to the center. (*Rice* v. *Ruddiman,* 10 Mich. 125 ; *Clute* v. *Fisher,* 65 id. 48 ; *Ridgway* v. *Ludlow,* 58 Ind. 248 ; *Lembeck* v. *Nye,* 47 Ohio St. 326 ; 24 N. E. R. 686.) And in *Ridgway* v. *Ludlow,* it was held that prescriptive right acquired by adverse possession to land adjacent to such a lake extended to the middle of it.

In *Hardin* v. *Jordan* (140 U. S. 371), the subject had very thorough consideration, was elaborately discussed, and the conclusion there reached and adopted by a majority of the court was, that by the common law the grantee of lands bounded upon an inland non-navigable lake or pond takes title to its center. The lake there in question is in the state of Illinois, and is two or three miles in length. And the court reviewed the case of *Trustees of Schools* v. *Schroll* (*supra*), which was criticised, held not to have correctly declared the common law applicable to that state, and was disregarded as authority on the subject. This is in harmony with the rule in our state that the title to the soil under such waters is in the riparian owners ; and analogously to that relating to the conveyance and proprietorship of lands

bounded on fresh-water streams, it would seem for the same reason to be alike applicable to such lakes and ponds.

The reason for the distinction in the cases where it has been recognized has not been the subject of much discussion by the courts. But a reason given by Judge GRESHAM in *State of Indiana* v. *Milk* (11 Fed. Rep. 389), had relation to the inconvenience or difficulty in locating in the lakes the lines of the several proprietors of the uplands. He was dealing with a lake covering fourteen thousand acres. But he added that, "A person might by purchasing the lands surrounding a lake, in view of the size and other circumstances, be held to own the bed. Each case depends largely on its own facts."

While a lake may be of such form as to render the designation in it of the lines of the several riparian owners in certain cases somewhat difficult that fact in its relation to the practical effect of the rule is not an objection to its general application. No case will probably arise in which their respective rights in that respect may not be ascertained and defined in reference to the location and extent of the boundaries of their lands on or along the lake. Bends or bays in rivers may to some extent present like difficulties. The value, such as they have, of small non-navigable lakes and ponds as a general rule is mainly in their relation to the adjacent lands. There may, however, be exceptional cases. The pond in question has since the conveyance of the surrounding lands become useful in its production of ice by reason of railroad facilities for transportation of it to market. But this fact and the extent of the business and of the preparations made there by the defendant to carry it on, have no bearing upon the question we are now considering. The inquiry has relation to the title in the soil under the water of the pond or lake. The views already given lead to the conclusion that the common law relating to the construction and extent of grants of land bordering and bounded on such waters, is applicable alike to conveyance bounding lands on fresh-water rivers and small non-navigable lakes or ponds. Such is the character of the

one in question; and whether its bed was embraced in or excluded from the grants made by the deeds before mentioned is dependent upon their construction. The boundaries are described as along the pond; and unless in some manner qualified or restricted they by legal construction had the effect to embrace its bed within their grants. This in such case is the presumed intent unless the contrary appears. (*Luce* v. *Carley*, 24 Wendell, 451; *Ex parte Jennings*, 6 Cow. 518; *Mott* v. *Mott*, 68 N. Y. 247.)

It is, however, urged that as in the last three of those deeds the lines along the pond are described by courses and distances, the intent thus appears to restrict the grants to those lines, and that such is the legal effect. It may be observed that the outer boundary of the waters of the pond are represented by courses and distances as appears by the deeds, and since they are described as along the pond, was the boundary in legal effect necessarily so restricted by that method of description as to exclude the bed from the grants? A boundary line described as "along the shore" of a fresh-water stream does not extend the grant to its center (*Child* v. *Starr*, 4 Hill, 369), and a like construction is applicable to a boundary by the bank of such a stream. (*Starr* v. *Child*, 5 Denio, 599; *Halsey* v. *McCormick*, 13 N. Y. 296.) In those cases the prescribed limitation of the boundary lines to the shore and bank did not permit the extension of the grant by construction to the thread of the streams. And the same may be said of *People* v. *Jones* (112 N. Y. 597).

Our attention has been called to cases relating to conveyances of lands adjacent to highways, where it was held that a line described as running along a highway from and to monuments located on one side of it, did not vest in the grantee title to its center, but by the terms of the description the roadbed was excluded. (*Jackson* v. *Hathaway*, 15 John. 447; *Kings County Fire Ins. Co.* v. *Stevens*, 87 N. Y. 287; *Smith* v. *Slocomb*, 9 Gray, 36.) While there is in legal effect analogy between the boundary of grants on highways and streams there is this distinction that it is not practicable to locate monuments

in the channels of the latter, and it is usual to refer in the description of boundary to their location adjacent to the water to mark the place of intersection with the stream.

In *Luce* v. *Carley* (24 Wendell, 451) among the courses in the description of the premises were those to a hemlock stake "standing on the east bank of the river, from thence down the river as it winds and turns 24 chains and ninety-four links to a hard maple tree," etc. This maple tree, as appears by the opinion of the court, was described as standing on or near to the east bank. And in holding that the grantee took title to the center of the river the court said : "It is never thought that monuments mentioned in such a deed as occupying the bank of the river, are meant by the parties to stand on the precise water line. They are used to fix the *termini* of the line which is described as following the sinuosities of the stream * * *. Where the grant is so framed as to touch the water of the river and the parties do not expressly except the river, if it be above tide, one-half of the bed of the stream is included by construction of law. If the parties mean to exclude it they should do so by express exception."

In *Child* v. *Starr* (4 Hill, 375) the chancellor remarked that "running to a monument standing on the bank, and from thence by the river or along the river, etc., does not restrict the grant to the bank of the stream, for the monuments in such cases are only referred to as giving the direction of the lines to the river, and not as restricting the boundary on the river."

In *Seneca Nation of Indians* v. *Knight* (23 N. Y. 498), the boundary of the land was described as beginning at a post standing on the bank of Lake Erie, at the mouth and on the north side of Cattaraugus creek, and after describing other lines, proceeded, "thence * * * to a post standing on the north bank of Cattaraugus creek ; thence down the same and along the several meanders thereof to the place of beginning." It was held that the grant was to the center of the creek. The court there referred to and approved the remark before mentioned of the chancellor in the *Child's* case, and

added: Parties may restrict their grants, "but the restriction ought to be found in very plain and express words." And in *Kings County F. Ins. Co.* v. *Stevens*, the court cited with approval the *Seneca Nation* case, and in like manner noticed such remark of the chancellor in the *Child's* case. .

Inasmuch as a boundary by or along a water course is effectual to take the grant by legal construction to its thread, it would seem that the application of the courses and distances of the boundary along the water of the stream may not be treated as qualifying the effect which would be given to the grant if they were omitted. If the boundary were not expressed as along the pond, it might and would be assumed that there was an intent to so restrict. And it may be observed that the courses and distances between the outer lines intersecting it are not controlled by any monuments given in the deeds other than along the pond.

A question somewhat similar to this arose in *Rix* v. *Johnson* (5 N. H. 520; 22 Am. Dec. 472). There the boundary on a river was described by courses and distances between the two points of intersection of the outer lines with the stream by reference to monuments located near it; and it was held that the boundary was in the river. The present case is distinguishable from those where the line is described as along the shore or on the bank. Here there is nothing in the terms of the deeds which places the boundary along there outside the water of the pond. The boundary is described as along the pond. The courses and distances given represent the sinuosity of the line of connection of the water with the shore; and the boundary as described along the pond as generally understood means on its water. And the fact that the length of the lines running to and from the monuments at the pond is the distance to and from them on the bank, does not of itself affect the question. Such is usually the case of the description of land bounded on streams in which the grants are treated as *ad filum aquæ*. And as said by Mr. Justice COWEN, in *Luce* v. *Carley*, where the grant is so framed as to touch the water of the river, one-half the bed of the stream is included

by construction of law. This, of course, means to the extent of the boundary in contact with the water.

It is a matter of common knowledge, in respect to lands bordering on streams and other bodies of water, that it is usual in surveys, when made, to so describe the uplands as to compute the number of acres they contain, as generally in them, exclusive of the soil beneath, the water is mainly the value, and the quantity of the uplands embraced in a conveyance constitutes, in view of the situation, the basis for the measure of the consideration.

The conveyances embracing the land surrounding this lake or pond were made many years ago. No circumstances appear bearing upon the purpose, construction or effect of those conveyances inconsistent with the intent of the grantors to include its bed within them.

If these views are correct, the conclusion of the trial court that the plaintiffs had no title to the *locus in quo* was justified by the evidence.

And the order should be reversed and the judgment affirmed.

All concur.

Judgment accordingly.